659 S.E.2d 112

An L. GROSSHUESCH, Guardian and Conservator of Eleanor A. Breedlove, and An L. Grosshuesch, Guardian and Conservator of Bernard H. Breedlove, Respondents/Appellants,

v.

Lisa CRAMER, Nathan Cramer, Lawrence H. Gray, Jr., Duane Marie Gray, and Sweetgrass Land Company, LLC, Defendants,

of whom Lisa Cramer is Appellant/Respondent.

and

Ex Parte Charles B. Macloskie, Appellant,

In re An L. Grosshuesch, Guardian and Conservator of Eleanor A. Breedlove, and An L. Grosshuesch, Guardian and Conservator of Bernard H. Breedlove, Respondents,

v.

Lisa Cramer, Nathan Cramer, Lawrence H. Gray, Jr., and Sweetgrass Land Company, LLC, Defendants.

and

An L. Grosshuesch, Guardian and Conservator of Eleanor A. Breedlove, and An L. Grosshuesch, Guardian and Conservator of Bernard H. Breedlove, Appellants,

v.

Lisa Cramer, Nathan Cramer, Lawrence H. Gray, Jr., Daune Marie Gray, and Sweetgrass Land Company, LLC, Respondents.

and

Ex Parte Lionel S. Lofton, Appellant,

In re An L. Grosshuesch, Guardian and Conservator of Eleanor A. Breedlove, and An L. Grosshuesch, Guardian and Conservator of Bernard H. Breedlove, Respondents,

v.

Lisa Cramer, Nathan Cramer, Lawrence H. Gray, Jr., Duane Marie Gray, and Sweetgrass Land Company, LLC, Defendants.

No. 26453.

Supreme Court of South Carolina.

Heard Jan. 9, 2008.

Decided March 10, 2008.

14

18

Lionel S. Lofton and V. Lynn Lofton, both of Lofton & Lofton, of Charleston, and Charles B. Macloskie, of the Macloskie Law Firm, of Beaufort, for Appellant/Respondent Lisa Cramer and for Appellants Lofton and Macloskie.

⸴ Richard S. Rosen and Andrew D. Gowdown, both of Rosen, Rosen & Hagood, of Charleston, for Respondents/Appellants.

Chief Justice TOAL.

These consolidated appeals relate to several discovery orders in a civil action. Bernard and Eleanor Breedlove initiated the underlying lawsuit seeking to set aside several transfers of assets to Lisa and Nathan Cramer on the grounds of fraud and undue influence. The parties contest several issues on appeal, but the foremost is whether the trial court erred in imposing discovery-related sanctions on Lisa Cramer. The Cramers argue that the trial court should not have imposed sanctions, and the Breedloves argue that the trial court should have imposed more. Additionally, the Cramers' attorneys argue that the trial court erred in requiring them to produce documents and information relating to the location of assets allegedly transferred from the Breedloves, and the Breedloves argue that the trial court erred in issuing a protective order making discovery in the case confidential.

Though these issues are couched as different types of discovery disputes, they deal primarily with the Cramers'

invocation of the privilege against self-incrimination found in the Fifth Amendment to the United States Constitution. Because we find that the trial court did not apply the proper standard when judging the Cramers' invocation of the Fifth Amendment, we vacate the trial court's imposition of discovery-related sanctions on Lisa Cramer. Similarly, we find that the trial court erred in ordering the Cramers' attorneys to produce documents and information which relate to their representation of the Cramers. The remaining questions on appeal, specifically, whether the trial court erred in declining to impose additional sanctions on Lisa Cramer and whether the trial court erred in issuing a protective order, are not immediately appealable and are therefore dismissed.

### FACTUAL/PROCEDURAL BACKGROUND

The Breedloves are elderly individuals with substantial assets who reside in Hilton Head, South Carolina. In their complaint, the Breedloves alleged that they became acquainted with Lisa Cramer through her employment at the Breedloves' bank, and that after learning of the Breedloves' substantial wealth, the Cramers conspired to develop an enduring relationship with the Breedloves and to exploit that relationship for financial gain. The Breedloves alleged that over time, they transferred several million dollars worth of real estate and liquid assets to the Cramers. During the time of these transfers, the Breedloves were allegedly suffering from some degree of dementia related to their advanced age. The Beaufort County Probate Court appointed An L. Grosshuesch as guardian and conservator for the Breedloves after the Breedloves commenced this lawsuit.

This appeal represents the third time this Court has addressed issues arising out of this litigation. As their first step in defending the lawsuit, the Cramers requested that the trial court stay the suit pending the resolution of the criminal actions filed against them relating to these conveyances. The trial court denied this request, and we dismissed the Cramers' appeal from the denial of the stay on the grounds that the trial court's order was interlocutory, not affecting the merits, and thus, not immediately appealable.

Next, this Court addressed the trial court's denial of the Breedloves' request for a preliminary injunction. The Breedloves sought to prevent the Cramers and others acting on the Cramers' behalf from transferring or otherwise disposing of the assets at issue. In so seeking, the Breedloves filed lis pendens against the subject real estate and sought a preliminary injunction preventing the Cramers from exercising control over some of the accounts and assets in dispute. In seeking the injunction, the specific focus of the Breedloves' concern was a Merrill Lynch account which they alleged initially contained $2 million, but has been almost completely depleted. The trial court denied the Breedloves' request for an injunction, and this Court reversed. *Grosshuesch v. Cramer*, 367 S.C. 1, 623 S.E.2d 833 (2005).

The consolidated appeals now at issue deal with several orders related to discovery. Over the course of this litigation, the Breedloves sought extensive discovery relating to the amount of assets the Cramers received from the Breedloves, expenses the Cramers appeared to authorize on behalf of the Breedloves, and the present location of all assets acquired from the Breedloves. When the Breedloves received no response to their discovery requests, they sought and were granted an order compelling Lisa Cramer to respond to discovery.[1]

The Cramers again entered no substantive response to the vast amount of Breedloves' discovery, answering only that any response to discovery would be deemed a waiver of rights secured by the Fifth Amendment to the United States Constitution and by Article I, Section 12 of the South Carolina Constitution. After receiving what were in their view insufficient responses to their discovery requests, the Breedloves sought an order of contempt and sanctions as to Lisa Cramer. The trial court ordered Lisa Cramer to fully respond to discovery and held her in contempt, but imposed no sanctions. In this order, the trial court additionally prohibited the Breedloves from disseminating any information acquired in discovery to anyone not directly connected with this litigation. The

---

1. Counsel for Nathan Cramer did not appear at the hearing on the motion to compel. From this point on, the parties appear to have been content to litigate these discovery disputes solely from Lisa Cramer's perspective.

purpose of this protective order, in the trial court's view, was to guard the integrity of the case and to prevent any criminal harm to the Cramers from their discovery responses. Lisa Cramer appealed from her finding of contempt, and the Breedloves cross-appealed the imposition of the protective order.

Although the Cramers' depositions followed this contempt order, the Breedloves' quest for information fared no better. Ultimately, the trial court entertained a second motion for contempt and sanctions arising out of Lisa Cramer's essentially blanket refusal to answer questions in her deposition. The trial court denied this request for contempt and sanctions, and the Breedloves appealed.

Roughly around the same time they served their initial discovery requests, the Breedloves issued subpoenas duces tecum to the Cramers' attorneys. The subpoenas requested that the attorneys produce documents evidencing any fees they had received from the Cramers, withdrawals from the $2 million Merrill Lynch account, and transfers of cash to the Cramers from the Breedloves. The trial court denied the attorneys' requests to quash the subpoenas and ultimately held the attorneys in contempt. Both attorneys appealed.

As a result of the parties' prolific appealing at each stage of litigation, the court of appeals had several appeals related to this litigation pending by early 2007. Specifically, the court of appeals had the appeal and cross-appeal relating to the order holding Lisa Cramer in contempt for her initial discovery responses; the Breedloves' appeal of the order declining to hold Lisa Cramer in contempt for her deposition conduct; and the Cramers' attorneys' appeals from their contempt orders. This Court issued an order certifying and consolidating all of the pending appeals, and the parties present the following issues for review:

I. Did the trial court err in holding Lisa Cramer in contempt for failing to respond to discovery? (Lisa Cramer's appeal)

II. Did the trial court err in finding the Cramers' attorneys in contempt for failing to comply with the subpoenas duces tecum? (The attorneys' appeals)

III. Did the trial court err in issuing a protective order prohibiting the Breedloves from disseminating any information or discovery responses to anyone not directly connected with this litigation? (the Breedloves' cross-appeal)

IV. Did the trial court err in denying the Breedloves' second request for contempt and sanctions as to Lisa Cramer? (the Breedloves' appeal)

## LAW/ANALYSIS

### I. The Order of Contempt

Lisa Cramer argues that the trial court erred in holding her in contempt for failing to respond to discovery. We agree.

■ Both the Fifth Amendment to the United States Constitution and Article I, Section 12 of the South Carolina Constitution declare that no person shall be compelled to be a witness against himself in any criminal case. In interpreting the Fifth Amendment, the privilege against self-incrimination has been explained in practical terms as an assurance that an individual will not be compelled to produce evidence or information which may be used against him in a later criminal proceeding. *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). The settled law provides that the privilege extends not only to answers that would themselves support a criminal conviction, but also to answers furnishing a link in the chain of evidence needed to prosecute an individual. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

■ That a party has invoked the privilege against self-incrimination, however, does not end the matter. Instead, it is well-settled that an invocation of the privilege is confined to instances where a person has reasonable cause to apprehend danger from his answer. *Id.* Indeed:

The witness is not exonerated from answering merely because he declares that in doing so he [will] incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified ... and to require him to answer if "it clearly appears to the court that he is mistaken."

*Id.* (*citing Temple v. Commonwealth,* 75 Va. 892, 899); *see also First Union Nat'l Bank v. First Citizens Bank & Trust Co. of S.C.,* 346 S.C. 462, 467, 551 S.E.2d 301, 303 (Ct.App. 2001).

The Fourth Circuit has instructed that a court judging the invocation of the privilege against self-incrimination asks first whether the information is incriminating in nature, and second, whether there is a sufficient possibility of criminal prosecution to trigger the privilege. *United States v. Sharp,* 920 F.2d 1167, 1170–71 (4th Cir.1990). In determining whether the information is incriminating, the *Sharp* court recognized that at least two categories of potentially incriminating questions exist. First, there are questions whose incriminating nature is evident on the question's face in light of the question asked and the surrounding circumstances. *Id.* at 1170. Second, there are questions which though not overtly incriminating, can be shown to be incriminating through further contextual proof. *Id.* It is with these principles in mind that we turn to an analysis of the trial court's order holding Lisa Cramer in contempt.[2]

When comparing this analytical rubric to the trial court's order of contempt, it is clear that the order does not apply the correct standard when examining Lisa Cramer's invocation of the constitutional privilege. The trial court opined that the privilege against self-incrimination was completely inapplicable in the instant case for two reasons. First, the trial court noted that the Cramers have maintained that the transfers from the Breedloves were gifts. Second, the trial court emphasized that the Cramers have unequivocally stated that they intend on testifying at their criminal trial. The Breedloves rely heavily on these justifications in their argument before this Court, but although these facts are extremely odd, they are irrelevant to constitutional privilege analysis.

---

2. As our recitation of the law illustrates, there is a great deal of jurisprudence interpreting the Fifth Amendment's privilege against self-incrimination and setting forth clear guideposts for judging an invocation of the privilege. The parties have not offered any arguments as to how the analysis might differ under Article 1, Section 12 of the South Carolina Constitution, so we assume in this case that the analysis under the two provisions is identical.

■■ Dealing first with the fact that the Cramers have maintained that the transfers from the Breedloves were gifts, the question when judging the application of the privilege against self-incrimination does not revolve around what defenses a party has asserted in a civil action, but whether there is a reasonable possibility that requiring a party to answer a certain question would provide information that could be used against the party in a criminal proceeding or would lead to the discovery of such information. *Hoffman,* 341 U.S. at 486–87, 71 S.Ct. 814; *Sharp,* 920 F.2d at 1170. The Cramers are entitled to assert that they did not engage in any criminal conduct over the course of their relationship with the Breedloves, and this entitlement applies with equal force in both this action and the pending criminal action. Just as they would not lose the protections against self-incrimination by entering a criminal plea of not-guilty, so too does their assertion in this action that these transactions were arms-length have no impact on the analysis of whether the Cramers have a reasonable fear that their answers provided in discovery might be used against them in a criminal proceeding.

■ The trial court's speculation about whether the Cramers would testify at their criminal trial suffers from a similarly fatal flaw. We are aware of no authority providing that a party waives the application of the privilege against self-incrimination by stating that they ultimately intend to testify at trial. Courts employ a high bar when judging the waiver of constitutional rights. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (noting that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). In this vein, we think that a pronouncement that one intends to waive a constitutional right in the future does not amount to a waiver of that right. Indeed, it stands to reason that if one says he intends to waive a right in the future, he is invoking that right in the present.[3]

---

3. The case *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), is not to the contrary. That case deals with the entirely different question of whether inconsistent conduct with respect to the invocation of the Fifth Amendment may be used as impeachment evidence if a party takes the witness stand.

What then were the circumstances available for the trial court to consider in making its decision in this case? The record reflects that the trial court possessed the following information: (1) that the Breedloves sued the Cramers seeking to set aside several transfers of assets; (2) that the Breedloves are seeking discovery as to a great deal of information, some of which deals directly with their relationship to the Cramers and their transfers of assets to the Cramers; and (3) that the Cramers have been involved in a criminal proceeding which relates to their receipt of assets from the Breedloves since before the inception of this civil action. Given this information, the second step of the privilege analysis is the easy assessment. It is clear that a criminal prosecution of the Cramers is not an event which might occur sometime in the future—it is a present reality.

The more difficult question, in our opinion, is the examination of the nature of the questions asked in this case. It is arguable, we think, that any discovery directed at transfers of assets from the Breedloves to the Cramers might be incriminating on its face. It would seem that such discovery directly seeks the information and transactions which are at the heart of the pending criminal proceeding involving the Cramers. Accordingly, it would appear probable that the Cramers could have a reasonable fear that their answers to questions focused on this information would ultimately be used against them in the pending criminal proceeding.

But not all of the Breedloves' focus in discovery was so directed. During discovery, the Breedloves sought information related to the Cramers' marriage, their employment history, and other areas which do not implicate the Cramers' relationship with the Breedloves or transfers of asserts over the course of that relationship. Though it is possible that the discovery of information relating to these subjects could implicate the privilege against self-incrimination, that is not the only possibility. Indeed, when judging the invocation of the privilege in response to these and similar questions, it might have been reasonable for the trial court to ask for more information in order to effectively judge whether there was a reasonable possibility that answers to these questions would provide incriminating information. Lisa Cramer offered the

trial court nothing more, and for this reason, a passage in *Hoffman* seems to ring true:

> The witness here failed to give the judge any information which would allow the latter to rule intelligently on the claim of privilege for the witness simply refused to say anything and gave no facts to show why he refused to say anything.

341 U.S. at 484, 71 S.Ct. 814.

As this analysis illustrates, the fault for swaying the trial court's attention from the proper standard is shared among the parties. For while we have outlined why the reasons offered by the Breedloves do not measure up, we must also reject at least part of the Cramers' argument relating to the constitutional privilege. The Cramers have maintained that once a witness invokes the privilege against self-incrimination, that invocation is due a significant degree of deference and the court may not inquire further. Of course, the principle of deference to a witness's fear of self-incrimination is included in the recognition that a court may only require a witness to answer a question when "it clearly appears to the court that he is mistaken," and that "if the witness, upon interposing his claim, were required to prove the hazard [of self-incrimination] in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. But with these principles of deference in mind, courts have nonetheless instructed that the question of application of the privilege is one for the court, and that the guiding principle in a self-incrimination inquiry is the objective reasonableness of a witness's claimed fear of future prosecution. *Sharp*, 920 F.2d at 1171. In this case, the Cramers correctly state that the witness's fear of self-incrimination is due some deference, but they carry this principle too far. The final word on the application of the constitutional privilege is one for the court and the court alone.[4]

---

4. Though the trial court's protective order regarding discovery is the subject of a separate issue on appeal, we note that the use of protective orders has been widely rejected as a prophylactic measure which cures the compelled disclosure of incriminating information. As this Court and the federal courts have made clear, if the privilege against self-

As a housekeeping matter, the parties appear to have exhibited a great deal of unnecessary confusion regarding the injunction that this Court previously issued. Specifically, the parties have expressed confusion regarding a footnote in the Court's opinion which provides that "[s]ince possession of the assets is not at issue in either of the Cramer's pending legal matters, we do not view the Fifth Amendment as an impediment to the issuance of a preliminary injunction." *Grosshuesch v. Cramer*, 367 S.C. at 6 n. 4, 623 S.E.2d at 835 n. 4. The parties have, at times, asserted the position that this footnote represents a pronouncement from this Court on the applicability of the Fifth Amendment.

■ We do not understand the source of the parties' confusion. An injunction is binding upon the parties to an action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order. Rule 65(d), SCRCP. The clear import of the Court's footnote is that because the Cramers do not contest that they possess the property in dispute, there is no reason to doubt that the injunction will be effective. Any attempt to read more into the injunction relies upon verbiage that is not there.[5]

---

incrimination applies, the government must either be content with having no response to its inquiry, or must grant the witness immunity. *See State v. Thrift*, 312 S.C. 282, 301, 440 S.E.2d 341, 351 (1994) (interpreting S.C. Const. art. I, § 12); *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (addressing the Fifth Amendment). Although this principle is admittedly problematic in the civil context because neither a civil plaintiff nor a judge in a civil action possesses the power to grant a witness immunity, the principle simply establishes that in a civil action, a court may not compel a witness to disclose information to an adverse party *if* the court finds that the privilege against self-incrimination is properly asserted.

5. Furthermore, although the issue is not raised in this appeal, the parties expressed confusion in the trial court on the issue of posting a bond for the injunction. In our review of the trial court's denial of an injunction, the only issue presented was whether the trial court erred in holding that the Breedloves had an adequate remedy at law to secure the $2 million originally in the Cramers' Merrill Lynch account. We held that attachment was not an adequate remedy at law, and we remanded the matter to the trial court to proceed accordingly. The rule governing the issuance of injunctions controls whether the Breedloves are required to post a bond to secure the injunction in this case,

 In sum, the tortured procedural history of this case illustrates that debate regarding the application of the constitutional privilege against self-incrimination has fueled nearly every dispute brought to the trial court in this case. The Cramers asked that this action be stayed largely on the basis that litigating the civil proceeding would undermine their privilege against self-incrimination, and they have reiterated this concern in their motion to stay discovery and in response to the motions to compel and for sanctions. It is equally clear, however, that the trial court did not approach the question involving the constitutional privilege against self-incrimination from the proper perspective. For this reason, we must vacate the trial court's order finding Lisa Cramer in contempt. It should not be necessary to reiterate that when judging the invocation of the privilege against self-incrimination, the trial court must make a question-specific inquiry, focusing on whether a question is incriminating on its face, whether the question can be shown to be incriminating through further contextual proof, and whether there is a sufficient possibility of criminal prosecution to trigger the privilege.

## II. The Attorneys' Appeals

 The Cramers' attorneys argue that the trial court erred in finding them in contempt for failing to comply with the Breedloves' subpoenas duces tecum. We agree.[6]

 We can resolve this issue rather quickly, because the documents the Breedloves sought through the subpoenas are not properly discoverable through the Cramers' attorneys. Looking first at the court's order to Lionel Lofton, Lisa Cramer's attorney, the order requires Lofton to produce "any and all documents he has in his possession which disclose the location of any funds obtained by [Lisa Cramer] from the

---

see Rule 65(c), SCRCP, and the proposition that this Court somehow suspended the operation of this requirement is wholly inaccurate.

6. This issue is, of course, presently appealable because the trial court held the Cramers' attorneys in contempt, and we review a trial court's imposition of discovery sanctions under an abuse of discretion standard. See *Ex parte Whetstone*, 289 S.C. 580, 581–81, 347 S.E.2d 881, 881–82 (1986); *Laney v. Hefley*, 262 S.C. 54, 58, 202 S.E.2d 12, 14 (1974).

Breedloves," and the order further requires Lofton to disclose the amounts of any and all funds currently held in escrow or on deposit by him or his firm. This request is indistinguishable from the discovery the Breedloves sought from the Cramers, and it is clear that Lofton would only have obtained documents relating to the Cramers' finances through his status as Lisa Cramer's attorney. The Breedloves cannot discover documents through the Cramers' attorneys when the compelled disclosure by the Cramers would be protected by the privilege against self-incrimination. Thus, although the Rules of Professional Conduct provide that an attorney may disclose privileged information when ordered by the court, *see* Rule 1.6(b)(7), RPC, Rule 407, SCACR, we find the disclosure ordered here highly improper.

The order directed to Charles Macloskie, Nathan Cramer's attorney, provides another illustrative point. Specifically, the order professes that the Breedloves are seeking the information described in the subpoenas "in aid of enforcing an injunction issued by [this Court]," and that "without the information, [the Breedloves] cannot locate or trace the assets that are the subject of [this Court's] injunction." This justification is completely at odds with the purpose of discovery and demonstrates a fundamental misunderstanding by the Breedloves of their obligations in connection with this Court's injunction. Discovery is, of course, the process of seeking information from an adverse party to prepare for litigation, and the discovery sought in this case relates largely to the nature of the Breedloves' relationship with the Cramers. The Cramers have refused to respond to this discovery by asserting the constitutional privilege against self-incrimination, and this Court's issuance of an injunction has no impact on this analysis.

If the privilege against self-incrimination protects the Cramers from disclosing the location of their assets to the Breedloves, that is the end of the matter. The Court's issuance of an injunction does not grant the Breedloves a license to use discovery as a tool to ensure that the injunction is being given effect. As a court order, the injunction is binding on the Cramers, their agents and attorneys, and anyone in active concert with the Cramers receiving actual notice of the injunction. Rule 65(d), SCRCP. A party who

refuses to abide by an injunction entered by the court would of course be in contempt of court and subject to sanctions, and our jurisprudence clearly establishes that the proper procedure to determine whether a party should be held in contempt is to bring a summons and a rule to show cause. *See Toyota of Florence, Inc. v. Lynch,* 314 S.C. 257, 267, 442 S.E.2d 611, 617 (1994). Treating the injunction as a back door to allow the discovery of otherwise non-discoverable information gives the privilege against self-incrimination an impermissibly shallow dimension.

 Not to be outdone, the Cramers also misunderstand an important aspect of this Court's injunction. Specifically, the Cramers appear to overextend the privilege against self-incrimination and treat it as a limitation on what information a court may ascertain in its own right. Stated differently, the question of what information the Breedloves may not obtain in discovery is completely separate from what information a court may require to be disclosed, *in camera* if necessary, to ensure that court orders are observed. While the appearance that the Cramers are using money they obtained from the Breedloves to pay their attorneys' fees ought to be of significant concern, and thus, the Breedloves' desire for this information is understandable, this issue should be resolved rather quickly and easily without the involvement of the civil discovery process.

For these reasons, we reverse the trial court's decision finding the Cramers' attorneys in contempt.

### III. & IV. The Protective Order & The Order Denying Contempt

 The Breedloves argue that the trial court erred in issuing a protective order over discovery in this case and in denying their second request for contempt and sanctions as to Lisa Cramer. Though these issues raise interesting questions, the fact remains that discovery orders, in general, are interlocutory and are not immediately appealable because they do not, within the meaning of the appealability statute, involve the merits of the action or affect a substantial right. *Hamm v. S.C. Pub. Serv. Comm'n,* 312 S.C. 238, 241, 439 S.E.2d 852,

853 (1994); *Wallace v. Interamerican Trust Co.*, 246 S.C. 563, 568–69, 144 S.E.2d 813, 816 (1965).[7]

### CONCLUSION

For the foregoing reasons, these appeals are vacated in part, reversed in part, and dismissed in part. Specifically, we vacate the trial court's order finding Lisa Cramer in contempt; we reverse the trial court's finding of contempt as to the Cramers' attorneys; and we dismiss the remaining appeals as interlocutory and not immediately appealable.

MOORE, WALLER, PLEICONES and BEATTY, JJ., concur.

---

7. We take this opportunity to reiterate that while an appeal is pending, a lower court cannot act on matters affecting the issue on appeal. *See* Rules 205 & 225, SCACR. In the instant case, the trial court's orders dealing with contempt did not run afoul of this proscription, because while the trial court's first order deals with the subject of the Cramers' initial discovery responses, the second order deals with the subject of Lisa Cramer's responses to questions in her deposition.