# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Laurance H. Davis, Jr., Mary Jane R. Pike, Eva Marie Reynolds, and Rhoda G. Rentz, individually and in their capacities as the Limited Partners of Parkview Apartments, a South Carolina Limited Partnership, Appellants,

v.

Parkview Apartments, a South Carolina Limited Partnership, Apartment Investment and Management Company a/k/a AIMCO, Insignia Financial Group, Incorporated, AmReal Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a U.S. Shelter Corporation, ISTC Corporation, N. Barton Tuck, Jr., and John Doe, a generic designation for a party or parties whose true identity is unknown, Respondents.

Appellate Case No. 2010-180666

Laurance H. Davis, Jr., Marvin D. McCarthy, James W. Ivey and Erin E. Ivey, individually and in their capacities as the Limited Partners of Palmetto Apartments, a South Carolina Limited Partnership, Appellants,

v.

Palmetto Apartments, a South Carolina Limited Partnership, Apartment Investment and Management Company a/k/a AIMCO, Insignia Financial Group, Incorporated, AmReal Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a U.S. Shelter Corporation, ISTC Corporation, N. Barton Tuck, Jr., and John Doe, a generic designation for a party or parties whose true identity is unknown, Respondents.

Appellate Case No. 2010-180087

Laurance H. Davis, Jr., Rhoda G. Rentz, Mortimer M. Weinberg, Jr., Hodge Land Company, Incorporated, and Anna Trotter, individually and in their capacities as the Limited Partners of Roosevelt Gardens, a South Carolina Limited Partnership, Appellants,

v.

Roosevelt Gardens, a South Carolina Limited Partnership, Apartment Investments and Management Company a/k/a AIMCO, Insignia Financial Group, Incorporated, AmReal Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a U.S. Shelter Corporation, ISTC Corporation, N. Barton Tuck, Jr., and John Doe, a generic designation for a party or parties whose true identity is unknown, Respondents.

Appellate Case No. 2010-180086

Carolina Management Corporation of Beaufort, James B. Jackson, Whaley R. Hinnant, Jr., Mary Gasser Rawl, and Rhoda G. Rentz, individually and in their capacities as the Limited Partners of Pinewood Park Apartments, a South Carolina Limited Partnership, Appellants,

v.

Pinewood Park Apartments, a South Carolina Limited Partnership, Apartment Investment and Management Company a/k/a AIMCO, Insignia Financial Group, Incorporated, AmReal Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a U.S. Shelter Corporation, ISTC Corporation, N. Barton Tuck, Jr., and John Doe, a generic designation for a party or parties whose true identity is unknown, Respondents.

Appellate Case No. 2010-180088

Rhoda G. Rentz, Mary Jane Pike, Eva Marie Reynolds, and Joanne O. Mercy, individually and in their capacities as the Limited Partners of Orleans Gardens, a South Carolina Limited Partnership, Appellants,

v.

Orleans Gardens, a South Carolina Limited Partnership, Apartment Investment and Management Company a/k/a AIMCO, Insignia Financial Group, Incorporated, AmReal Corporation a/k/a and f/k/a USS Corporation a/k/a and f/k/a U.S. Shelter Corporation, ISTC Corporation, N. Barton Tuck, Jr., and John Doe, a generic designation for a party or parties whose true identity is unknown, Respondents.

Appellate Case No. 2010-176826

---

Appeal From Beaufort County
Doyet A. Early III, Circuit Court Judge

---

Opinion No. 27429
Heard November 13, 2012 – Filed August 6, 2014

---

**AFFIRMED**

---

Thomas A. Pendarvis, of Pendarvis Law Offices, P.C., of Beaufort, and Joel D. Bailey, of The Bailey Law Firm, P.A., of Beaufort, for Appellants.

Ellis M. Johnston II, of Haynsworth Sinkler Boyd, P.A., of Greenville, and Calvin Theodore Vick, Jr., of Harper Lambert & Brown, P.A., of Greenville, for Respondents.

**CHIEF JUSTICE TOAL:**    Appellants appeal the circuit court's decision dismissing these related cases and awarding sanctions against Appellants.  We affirm.

<h3 style="text-align:center">FACTS/PROCEDURAL BACKGROUND</h3>

Appellants are limited partners in five separate limited partnerships and have asserted legal claims in five separate actions against their general partners, Respondents.[1]  Each of the limited partnerships owned separate apartment complexes in one of the three counties—Beaufort, Orangeburg, and Charleston.  On appeal, each of the cases involves a different grouping of limited partners,[2] different properties, and different facts.

In essence, the limited partnerships were formed in the 1960s to construct and operate the properties at issue, affordable housing projects for low-income citizens in the three counties.  Respondents became general partners around 1975, and from that point forward, Appellants took no part in the management or business affairs of the complexes.  In 1984, Respondents notified Appellants that they had contracted to sell the properties to Boston Financial Group (BFG).  The terms of the sale called for a small amount to be paid upfront but the majority would be paid in 1999 in a "balloon" payment with accruing interest.  However, BFG defaulted on the payment, and sold the properties without intervention from the partnerships.  All of the claims stem from Respondents' roles in selling the properties and their actions in the aftermath of BFG's default.

On April 22, 2003, certain Appellants filed the complaint in *Davis v. Parkview Apartments* (the *Parkview* case).  On July 7, 2003, Respondents filed various motions, including a motion to dismiss certain claims against certain Respondents and a motion to strike or make more specific allegations contained in

---

[1] All Appellants and Respondents are successors in interest to either the original limited partners (except for Laurance Davis) or original general partners.

[2] In other words, some of the limited partners held interests in more than one of the limited partnerships, and some held an interest in only one of the limited partnerships, but none of the limited partners held interests in all of the partnerships.

Appellants' complaint.  The circuit court denied the motions.  Appellants filed an amended complaint on March 23, 2004, alleging causes of action at law for damages, including, *inter alia*, breach of fiduciary duty and causes of action for equitable relief.  On April 9, 2004, Respondents filed an Answer, setting forth a general denial and affirmative defenses, including, *inter alia*, the statute of limitations.  On April 13, 2004, Respondents filed a motion to dismiss and other related motions.  By order dated February 11, 2005, the court dismissed one cause of action, styled "bad faith," but denied the motion to dismiss as to the remaining causes of action.

On October 13, 2005, certain Appellants filed complaints in *Davis v. Palmetto Apartments* (the *Palmetto* case) and *Carolina Management Corporation of Beaufort v. Pinewood Park Apartments* (the *Pinewood Park* case), and on October 17, 2005, certain Appellants then filed complaints in *Rentz v. Orleans Gardens* (the *Orleans Gardens* case) and *Laurance Davis v. Roosevelt Gardens* (the *Roosevelt Gardens* case).  In each of these cases, the groups of Appellants alleged causes of action at law for damages, including, *inter alia*, a claim for breach of fiduciary duty, and causes of action for equitable relief.  Respondents answered on January 17, 2006, setting forth a general denial and affirmative defenses, including the statute of limitations.

By administrative order dated March 7, 2006, all five of the cases were assigned to Circuit Judge Doyet A. Early III "to hear and decide all pre-trial motions and other matters pertaining to these cases, including the trial and post-trial motions."  The purpose of assigning the cases to a single circuit court judge was to "promote the effective and expeditious disposition of this litigation by uniform rulings and [to] conserve the resources of the parties, their counsel, and the judiciary."  However, these cases have never been consolidated.

The Record in this case is voluminous, and illustrates the complex and, at times, contentious nature of these proceedings.  The circuit judge presided over numerous motion hearings and issued numerous orders over the course of this litigation.  However, this appeal concerns a final order, dated April 9, 2010, and entitled "Order Granting Defendants' Two Motions for Sanctions, Finding Plaintiffs in Contempt of Court, and Dismissing the Above-Captioned Actions as Sanctions for Plaintiffs' Contempt" (the Dismissal Order), in which the circuit judge dismissed all of the cases and awarded fees and costs to Respondents as sanctions for Appellants' continued refusal to comply with his previous discovery rulings.  In addition, Appellants appeal the judge's failure to disqualify himself at

the outset of this litigation and late refusal to recuse himself.

From the outset, the statute of limitations emerged as an important issue in this case. On January 17, 2006, Respondents moved for summary judgment in the *Palmetto*, *Orleans Gardens*, and *Roosevelt Gardens* cases based on the affirmative defense that Appellants' legal claims in these cases were barred by the statute of limitations.[3] In support of the motion for summary judgment, Respondents served Appellants with Requests for Admission in order to ascertain the point at which Appellants became aware of the alleged injuries that they claimed. On February 13, 2007, the court denied the motion, granting Respondents leave to raise the statute of limitations defense again after the commencement of discovery in the

---

[3] Respondents contend that all of the legal claims alleged in the complaints center on Respondents' business judgment in 1999 when they concluded the properties at issue had no value above the HUD mortgages (with the exception of the *Pinewood Park* case), and that repossessing the apartments was not in the best interests of the limited partnerships. However, Respondents also contend that Appellants allege injury to the limited partnerships as far back as the early 1980s in each case, including, *inter alia*, Respondents' alleged: failure to entertain other offers to purchase the properties in the 1980s, misrepresentations of the purchaser's financial solvency, sale of the properties to an entity created by BFG, instead of BFG, failure to forward appropriate documentation of the sale, failure to properly secure the notes, and undervaluation of the properties in order to acquire various limited partnership interests. Appellants asserted that Respondents were estopped from asserting their statute of limitations argument because all parties agreed to postpone discovery in the *Parkview* case and the filing of additional related cases in an attempt to resolve all of the cases through mediation, including those that had not yet been filed. On the other hand, Respondents contend they agreed to postpone discovery in the *Parkview* case only, but did not agree to stay the statute of limitations applicable in any other cases Appellants had not yet brought. Ultimately, the mediation fell through. Appellants contend that mediation was cancelled because the jointly retained independent appraiser failed to complete the appraisals in time. Regardless of the reason for the failure of the mediation to go forward, Respondents point out in their brief that the mediation and surrounding negotiations fell through as of July 26, 2004, but Appellants did not file the remaining cases until October 2005. Therefore, Respondents contend, whether or not they were estopped from asserting the statute of limitations during that period, Appellants' claims are still time-barred.

cases.

Respondents again moved for summary judgment with respect to the statute of limitations issue in the *Palmetto*, *Orleans Gardens*, and *Roosevelt Gardens* cases. The judge held a hearing on the motion on November 19, 2007. On June 17, 2008, the circuit court denied Respondents' motion because "a genuine issue exists as to material facts involving the statute of limitations."[4]

On August 28, 2008, Respondents served Appellants with supplemental discovery requests. After granting Appellants additional time to file their responses, on November 6, 2008, Respondents filed a motion to compel Appellants to respond to their discovery requests. Appellants served their initial discovery responses on November 14, 2008, but Respondents chose to proceed with their motion to compel, claiming Appellants failed to answer their discovery requests completely. Respondents specifically sought to compel Appellants to provide full and complete responses to Respondents' interrogatories and the production of all documents in Appellants' possession responsive to Respondents' requests for production. The court held a hearing on the motions on December 9, 2008.

On January 29, 2009, Appellants served their Supplemental Responses to the Discovery Requests, expressly providing that the responses were made only by Appellants in the *Parkview* action, and that Appellants in the other actions would supplement their responses "at a later date." Moreover, the *Parkview* Appellants only additionally produced the financial statements of Appellant Laurance Davis. Much of the remainder of the responses was identical to the previous responses.

By order dated March 3, 2009, entitled "Order Granting Defendants' Motion to Compel, dated November 6, 2008" (the Discovery Order), the circuit court granted Respondents' motion to compel, specifically finding that all of the Appellants were required to "provide full and complete responses" and "produce all documents in their possession, custody or control, which [were] responsive to" the discovery requests. The court took issue with Appellants' blanket method of objecting to the requests, "mak[ing] it impossible for [Respondents] to know if responsive information and/or documents [were] being withheld, and, if so, based

---

[4] During a later hearing, the circuit judge stated: "[T]here's some significant issues in this case from day one when I first got in it dealing with the statute of limitations problem. And I found that it was an issue of fact. And I still stuggle with that somewhat . . . ."

on which specific grounds."  In addition, the court specifically ordered Appellants to provide more information in their answers to interrogatories concerning Appellants' proposed expert witnesses and contents of their testimony.  The court also required Appellants to provide sufficient identifying information in their privilege log, so that Respondents could recognize which documents Appellants were withholding on the basis of the attorney-client privilege and assess the applicability of the privilege to those documents.  Finally, the court mandated the disclosure of pertinent discovery responses in all five cases (not just the *Parkview* case), and by all of the Appellants, stating "[e]ach and every [Appellant] is required to provide all information reasonably available to him or her, which would be responsive to any of the Interrogatories," and "each and every [Appellant] is required to produce all documents in his or her possession, custody or control, which would be responsive to any of the Requests for Production."[5] The Discovery Order required Appellants' compliance within thirty days.[6]  To date, Appellants have not complied with the Discovery Order.

Simultaneous to the discovery response dispute, the parties also disagreed regarding what materials were protected from disclosure by the attorney-client privilege.  Approximately one month after the court denied Respondents' summary judgment motion, counsel for Respondents indicated to the court that Appellants failed to produce a complete privilege log.  The court allowed Appellants thirty days to produce a complete privilege log.  On July 28, 2008, Appellants produced a new privilege log (the 7/28/08 privilege log) containing 90 documents, created between 1998 and 2004, for the first time in the litigation.  In their 7/28/08 privilege log, Appellants only included a description of the date, author, and recipient of each document, and the classification of each document, *i.e.* fax, letter, or memorandum.  At the December 9, 2008, hearing, Respondents also argued for the production of certain documents contained in Appellants' privilege log. Likewise, Appellants took issue with Respondents' claims of privilege.

---

[5] By order dated June 16, 2009, the circuit court denied Appellants' Rule 59(e) motion with respect to this ruling.

[6] On the same date the court issued the Discovery Order, it also issued an order, entitled "Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel, Dated July 29, 2005."  In that order, the circuit court found that certain of Appellants' discovery requests were overly broad and unduly burdensome and restricted those requests.

Therefore, on December 30, 2008, the court, with the consent of all of the parties, ordered Gary Clary to serve as special master for the purpose of conducting an *in camera* review of the so-called "privileged" documents at issue and to "make his ruling as to whether each such document is subject to discovery and production should be compelled."[7] The order required the special master to provide the circuit judge with a report setting forth his findings and conclusions. On December 31, 2008, Appellants provided a more descriptive privilege log (the 12/31/08 privilege log), which forms the basis of the current dispute over privilege.

Upon the special master's issuance of his reports on April 14 and 22, 2009, the circuit judge issued an order on June 2, 2009, adopting the special master's findings *in toto*, yet still permitting the parties to object to the findings and conclusions contained therein by the filing of a Rule 59(e) motion to alter or amend the judgment. Both Appellants and Respondents filed timely Rule 59(e) motions on June 11, 2009, and June 15, 2009, respectively. On July 6, 2009, the circuit judge held a hearing on the motions.

By order dated July 28, 2009, entitled "Order Amending Court's Order Dated June 2, 2009" (the Privilege Order), the circuit judge denied the Rule 59(e) motions in part, granted the motions in part, and amended his order adopting the findings and conclusion of the special master. Specifically, the court ordered Appellants to disclose 96 documents identified in their privilege log. The court found 32 of the allegedly privileged documents were not privileged because they had been disclosed to third parties, and the privilege had been waived with respect to the remaining 64 documents because, by filing suit, Appellants had placed the statute of limitations at issue in this case. To date, Appellants have still not complied with the court's order.[8]

Due to Appellants' continued noncompliance with the court's discovery orders, Respondents filed a motion for sanctions on July 24, 2009, for failure to comply with the Discovery Order and on August 10, 2009, for failure to comply with the Privilege Order. The circuit court held a hearing on Respondents' motions on August 24, 2009. At the hearing, Appellants represented to the court that they

---

[7] The circuit judge subsequently amended the order twice to increase the number of documents for the special master to review.

[8] Respondents were also ordered to produce certain documents previously deemed to be privileged, which they produced on August 3, 2009.

were filing supplemental discovery responses that same day, and that their responses would be in compliance with the courts orders.[9] The court admonished Appellants that their non-compliance, coupled with the looming January 2010 trial date in the *Parkview* case,[10] could elicit the court's dismissal of the case: "It's [the *Parkview* case] going to be tried in January, whenever it's set for. If they don't get the discovery I'm going to throw the case out." In addition, the court noted that the materials were relevant to the statute of limitations issue and Appellants had not produced a legitimate reason for not complying with the Discovery Order.[11] At the hearing, counsel for Appellants stated their clients were weighing their options as to whether to appeal the court's rulings. Despite stating that he was strongly leaning towards dismissing the cases, the circuit court decided to hold Respondents' motion in abeyance pending Appellants' decision to appeal, which provided Appellants with even more time to comply with the court's orders.[12]

---

[9] 
| [The Court:] | As an officer of the court you're telling me it's in full compliance with my order dealing with that area of discovery? |
| --- | --- |
| [Appellants' Counsel:] | Correct, your Honor, to the extent this stuff is information known to my clients. We've got it and it's being delivered. |

[10] The circuit court had already continued the trial date in the *Parkview* case from its May 2009 trial date due to the ongoing discovery dispute.

[11] In fact, counsel for Appellants at one point went so far as to admit Appellants did not want to disclose the discovery because it went to the statute of limitations issue:

| [The Court:] | Mr. Bailey, you don't like it [the Privilege Order] because it's opened up wide open the issue of the statute of limitations. |
| --- | --- |
| [Appellants' Counsel:] | That's certainly one reason, Judge. |

[12] The circuit court never placed this decision in writing.

Upon receipt of Appellants' supplemental responses, Respondents filed another supplemental motion for sanctions on August 27, 2009, claiming that Appellants had still not complied with the Discovery Order. Due to Appellants' attempts to appeal the Privilege Order,[13] the court did not hold a hearing on Respondents' supplemental motion to compel until January 14, 2010, at this point slightly over a week prior to the *Parkview* trial date. Appellants had still not provided Respondents with the discovery information concerning their experts' testimony. However, Appellants stated they were planning to provide the expert information on the day before trial. The court was not satisfied with this response: "This case has been going on for seven years, a long time. And don't hand me this about getting an expert on Friday. This is not an expert-to-be-given-on-Friday case." The court then addressed Appellants' continued noncompliance. One excuse Appellants gave for their failure to disclose the expert information is that they only had preliminary reports from the experts. Again, the court was not satisfied with this answer: "How can you not have a final opinion? . . . . [I]f you wanted to know what my expert's opinion was in a particular case, I would have to tell you. You would expect me to tell you. I expect you to tell them. I've ordered you to tell them, and you refuse to do so."

On January 25, 2010, *after* the trial date in the *Parkview* case, Appellants served Respondents with their Third Supplemental Responses, which again only addressed the *Parkview* case. Respondents again took issue with the adequacy of Appellants responses, especially as to the responses dealing with the substance of the expert testimony.

On February 22, 2010, Appellants filed a motion for protective order. Under the protective order, Appellants sought to submit the requested discovery under seal, conditioned upon the court allowing them to redact portions Appellants argued were privileged.

---

[13] On September 10, 2009, Appellants filed a Notice of Appeal in the court of appeals. On December 2, 2009, the court of appeals dismissed Appellants' appeal as premature and issued remittitur on December 17, 2009. On November 19, 2009, this Court denied Appellants' petition for writ of prohibition and certiorari after they appealed the court's discovery rulings. In addition, on October 6, 2009, Appellants applied for entry into the Business Courts, which was also denied on November 3, 2009.

Around that time, Appellants began to question their lawyers concerning the judge's impartiality based on disclosures he made throughout the case concerning his social relationships with counsel of record for Respondents and their family members. To substantiate these claims, Appellants sought additional discovery concerning financial information from the judge and records from a resort on Fripp Island, where the judge officiated in the wedding of Ann Ross Rosen, counsel of record for Respondents from 2007–09, to refute claims made by the judge concerning his relationship with Rosen.

At a hearing (granted to discuss Appellants' discovery requests and protective order) on March 29, 2010, the judge disclosed on the record his relationships with Respondents' counsel. Appellants again attempted to argue the reasons the judge should vacate his prior discovery orders and presented reasons the court should not sanction Appellants for failing to comply with these orders. Furthermore, counsel orally moved for the judge to recuse himself, which he denied. The judge memorialized his verbal denial of the recusal motion and reasons in an ensuing order dated October 7, 2010 (the Recusal Order), wherein the judge again outlined his relationships with Respondents' counsel, and decided not to recuse himself, noting that despite the fact that Appellants were "disappointed with some of the rulings of the [c]ourt . . . . such disappointment cannot form the basis for recusal."

Because Appellants still refused to comply with his orders, the court issued the Dismissal Order on April 9, 2010, finding Appellants were in contempt of court. As sanctions for Appellants' continued "willful" noncompliance with his discovery rulings, the court dismissed all five cases with prejudice and found Respondents were entitled to reasonable attorney's fees and costs incurred in connection with pursuing Appellants' compliance with the court's orders (to be determined at a later date). The court granted Appellants the opportunity to purge the contempt by complying with the Discovery Order and the Privilege Order within 25 days of the date of the Dismissal Order.

On September 16, 2010, the circuit court denied Appellants' Rule 59(e) motion to alter or amend the Dismissal Order. On October 25, 2010, the court denied Appellant's motion for protective order, holding that it was in effect an untimely Rule 59(e) motion disguised as a Rule 26(c) motion because it merely sough to amend the Privilege Order. On November 8, 2010, Appellants filed a Rule 59(e) motion seeking to amend the court's order, claiming they were denied due process because the court signed the proposed order submitted by

Respondents, which the court denied.

Appellants served their Notice of Appeal on January 28, 2011, in the court of appeals. By order dated March 9, 2011, this Court certified these cases for review pursuant to Rule 204(b), SCACR.

## ISSUES

I.     Whether the circuit judge erred in dismissing Appellants' claims and requiring them to pay costs and attorney's fees to Respondents as sanctions for Appellants' noncompliance with the court's discovery rulings?

II.    Whether the circuit judge erred in refusing to recuse himself?

## ANALYSIS

### I.     Sanctions

Appellants contend the circuit court erred in making the various discovery rulings in this case.[14]  As a matter of procedure, we note that Appellants have only appealed the order awarding sanctions to Respondents, the Dismissal Order. As such, the merits of the underlying discovery orders, including the Privilege Order and the Discovery Order, are not before us for consideration.

Throughout the course of the litigation, the circuit court issued numerous discovery rulings. The Record makes clear that Appellants considered an appeal of one or more of those orders, at one time even seeking review of the Privilege Order in the court of appeals, which was held to be interlocutory. However, to challenge the specific rulings of the discovery orders, the normal course is to refuse to comply, suffer contempt, and appeal from the contempt finding. *See, e.g.*, *Ex parte*

---

[14] In addition to arguments concerning the Privilege Order, Appellants take issue with circuit court orders relating to privilege and dated December 17, 2008; March 3, 2009; June 2, 2009; June 16, 2009; July 28, 2009; April 6, 2010; September 16, 2010; October 22, 2010; and December 11, 2010. Moreover, Appellants base their other discovery arguments on the Discovery Order, and other related discovery orders issued by the circuit court and dated December 17, 2008; March 3, 2009; March 3, 2009 (granting in part, denying in part); and April 6, 2010.

*Whetstone*, 289 S.C. 580, 347 S.E.2d 881–82 (1986) ("An order directing a party to participate in discovery is interlocutory and not directly appealable . . . . Instead of appealing immediately, a non-party has two alternatives. He may either comply with the discovery order and waive any right to challenge it on appeal, or refuse to comply with the order and appeal after he is held in contempt for his failure to comply.") (internal citations omitted). Appellants did not follow that route here. Rather, they continued along in the litigation, attempting to divert the implementation of the court's rulings by providing incomplete responses and causing delay through other tactics while they decided whether or not to surrender to the possibility of being held in contempt of court. However, during this time, Appellants continued to accept the circuit court's formulation of discovery. Right or wrong, these decisions form the law of the case, and Appellants are bound by them now. *ML-Lee Acquisition Fund, L.P. v. Deloitte & Touche*, 327 S.C. 238, 241, 489 S.E.2d 470, 472 (1997). Only after Respondents filed a motion for sanctions, and Appellants were found to be in contempt of court as part of those sanctions, did they appeal. While this was a final order for purposes of appellate review, as it ordered dismissal of the case, the merits of the underlying discovery orders are not before this Court on appeal. Thus, despite Appellants' vehement objections to the Privilege Order and Discovery Order, the only reviewable question before this Court is whether the sanctions were properly awarded.[15]

"The imposition of sanctions is generally entrusted to the sound discretion of the Circuit Court." *Downey v. Dixon*, 294 S.C. 42, 45, 362 S.E.2d 317, 318 (Ct. App. 1987). Therefore, an appellate court will not interfere with "a trial court's exercise of its discretionary powers with respect to sanctions imposed in discovery matters" unless the court abuses its discretion. *Karppi v. Greenville Terrazzo Co., Inc.*, 327 S.C. 538, 542, 489 S.E.2d 679, 681 (Ct. App. 1997) (citation omitted). "An 'abuse of discretion' may be found by this Court where the appellant shows that the conclusion reached by the lower court was without reasonable factual support, resulted in prejudice to the right of appellant, and, therefore, amounted to an error of law." *Dunn v. Dunn*, 298 S.C. 499, 502, 381 S.E.2d 734, 735 (1989)

---

[15] While the parties certainly mention the Privilege Order and Discovery Order and the various intermediate orders on which they are based in their brief, Appellants only raise general issues with those orders. Without specific objections to each item of discovery deemed discoverable by the circuit judge, the specific discovery findings are unreviewable on appeal.

(citation omitted). The appealing party bears the burden of demonstrating that the lower court abused its discretion. *Id.* (citation omitted).

Appellants argue the circuit court abused its discretion in awarding unduly harsh sanctions in this case. Specifically, Appellants contend the court abused its discretion by dismissing these cases under the facts, particularly because (1) less "draconian" punishments were available to the court; (2) Appellants agreed to receive a less harsh sanction and "took extraordinary steps to avoid dismissal"; (3) the judge consistently espoused Respondents' arguments as evidence constituting a factual basis to support his decisions; and (4) the judge deviated from South Carolina law to effect dismissal.

Rule 37(b)(2)(C), SCRCP, provides:

If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . .

An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

However, "when the court orders default or dismissal, or the sanction itself results in default or dismissal, the end result is harsh medicine that should not be administered lightly." *Griffin Grading & Clearing, Inc. v. Tire Serv. Equip. Mfg. Co.*, 334 S.C. 193, 198, 511 S.E.2d 716, 718 (Ct. App. 1999) (citing *Orlando v. Boyd*, 320 S.C. 509, 466 S.E.2d 353 (1996)). Thus, "[w]here the sanction would be tantamount to granting a judgment by default, the moving party must show bad faith, willful disobedience or gross indifference to its rights to justify the sanction." *Id.* at 198–199, 511 S.E.2d at 718–19 (citing *Baughman v. AT & T Co.*, 306 S.C. 101, 410 S.E.2d 537 (1991)); *see also Samples v. Mitchell*, 329 S.C. 105, 112, 495 S.E.2d 213, 216 (Ct. App. 1997) (stating when deciding the severity of sanctions "for failure to disclose evidence during the discovery process, the trial court should weigh the nature of the interrogatories, the discovery posture of the case, willfulness, and the degree of prejudice") (citations omitted).

We disagree with Appellants' claim that the sanctions imposed here were unduly harsh. With respect to the discovery orders regarding privileged documents, the circuit court made every effort to ensure that no privileged documents were compelled, and Appellants refused to comply merely because these rulings had adverse implications on their cases. We also note that the circuit judge provided Appellants ample opportunity to amend their discovery responses both before and after he issued the Discovery Order, and Appellants willfully and repeatedly failed to comply with the circuit court's orders in any meaningful way. Thus, in our view, Appellants' failure to comply with the various orders of the court was willful and deliberate and caused unnecessary delay of this case and prejudice to Respondents. Accordingly, we hold the circuit court did not err in issuing the Dismissal Order as a sanction for Appellants' noncompliance with the court's orders.[16]

## II.    Disqualification and Recusal

Appellants argue that the circuit judge was not legally qualified to accept or retain his assignment to preside over these cases at the time the cases were assigned to him. Specifically, Appellants contend that the judge violated his duty to fully disclose the full nature of his and his family's long-term relationships with Respondents' counsel, Ellis Johnston, and members of his family. Moreover, Appellants argue that the circuit judge violated his continuing duty to fully disclose additional relationships between him and members of his family with Johnston and members of his family, which developed following his acceptance of the assignment of this case, and the full nature of his relationships with attorneys Anne Ross Rosen and Marvin Infinger after they became counsel of record for Respondents. Thus, Appellants contend, this Court should vacate the order assigning the circuit judge to preside over these cases, and reassign them to a fair and impartial judge. Appellants contend that because a judge must disqualify himself and recusal motions are rare and unlikely to be overturned on appeal, an atmosphere exists "whereby, as in the present appeal, judges recognize the probable outcome of a recusal request and take advantage of that reality, to the undeserving prejudice of litigants with legitimate grounds for recusal." We disagree and find that the circuit judge was not disqualified from hearing this case and had no duty to recuse himself.

---

[16] We note that Appellants have the opportunity to purge the contempt by complying with the court's discovery rulings.

Pursuant to Canon 3(E)(1) of the Judicial Code of Conduct, "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."  Canon 3(E)(1), Rule 501, SCACR.  The judicial canons provide direction as to when disqualification may be necessary, including but not limited to, instances where: (1) the judge holds personal bias or prejudice towards a litigant or counsel or has personal knowledge of evidentiary facts in dispute in the proceeding; (2) the judge either worked on the case as a lawyer, a lawyer with whom the judge previously practiced law worked on the case while the judge was associated with the lawyer's firm, or the judge has been a material witness concerning the case; (3) the judge "knows" that he or a member of his family (spouse, parent, or child) has more than a *de minimus* economic interest in the litigation and the litigation will "substantially affect[]" that interest; or (4) the judge or his spouse or a person within the third degree of relationship to them (or the spouse of such a person) is either a party or the officer, director, or trustee of a party, is a lawyer in the case, known to have more than a *de minimus* interest that could be substantially affected by the litigation, or, to the judge's knowledge, is likely to be a material witness in the proceeding.  Canon 3(E)(1)(a)–(d).

"Under South Carolina law, if there is no evidence of judicial prejudice, a judge's failure to disqualify himself will not be reversed on appeal." *Patel v. Patel*, 359 S.C. 515, 524, 599 S.E.2d 114, 118 (2004) (citation omitted); *Simpson v. Simpson*, 377 S.C. 519, 522, 660 S.E.2d 274, 276 (Ct. App. 2008); *see also Ellis v. Procter & Gamble Distrib. Co.*, 315 S.C. 283, 285, 433 S.E.2d 856, 857 (1993) ("In cases involving a violation of Canon 3, this Court will affirm a trial judge's failure to disqualify himself only if there is no evidence of judicial prejudice.") (citations omitted).  Appellate courts "accord great weight to the trial judge's assurance of his own impartiality." *Id.*  It is the movant's responsibility to provide some evidence of the existence of the judge's impartiality. *Lyvers v. Lyvers*, 280 S.C. 361, 367, 312 S.E.2d 590, 594 (Ct. App. 1984) (citation omitted).

At the hearing on Appellants' recusal motion on March 29, 2010, and in the ensuing Recusal Order, the circuit judge revealed the following information concerning his relationships with Respondents' counsel of record:

(1) Johnston's wife's ex-husband was a fraternity brother of the judge 40 years ago;

(2) Infinger spent the night at the judge's lake house 30 years ago after both attended the wedding of another Haynsworth shareholder who

is not affiliated with this case;

(3) the judge's son and Johnston's son were fraternity brothers in college 14 years ago, went to Europe together 13 years ago, and have stayed in contact since then;

(4) the judge and his son accepted an invitation to go fishing with Johnston's brother;

(5) the judge officiated at Rosen's wedding in 2007, and the Rosen family provided him with accommodations at Fripp Island for the wedding;[17]

(6) Rosen's father, a surgeon, performed a medical procedure on the judge;

(7) Rosen's parents once lived in Bamberg, South Carolina, but the judge did not see them socially; and

(8) the judge has been a member of a social club that holds an annual white tie dance for approximately ten years, and in 2009, Johnston was invited to join the club.[18]

The court found that the mere fact that Appellants were "disappointed with some of the rulings of the [c]ourt . . . . such disappointment cannot form the basis for recusal." Moreover, the court stated:

Plaintiffs have no evidence proving bias or prejudice against them or for the Defendants. Instead, they argue that the [c]ourt ruled against them on several motions without basis in law or fact, and reason that

---

[17] As stated, *supra*, Appellants subpoenaed the Fripp Island resort where the wedding was held to determine the length of the judge's stay.

[18] The judge disclosed his relationship with Rosen and that he had been on the fishing trip with Johnston's brother when the case was assigned to him. He disclosed his son's relationship with Johnston's son via conference call on February 13, 2008.

the [c]ourt's relationship with [d]efense counsel is the sole cause of these rulings. Their Motion for Recusal is made without basis or justification, with the sole purpose of polluting the record and intimidating me into recusal. I refuse to comply. I have addressed this issue repeatedly, openly, and unabashedly, and though Plaintiffs continue to harass and prod me to recuse myself, the law does not justify said action, and thus I refuse to do so.

This litigation is now over five years old. Many, many hours have been devoted by the judiciary and court personnel in getting this case ready to try and both sides [] have incurred substantial attorney's fees. To start a new [sic], absent any bias or prejudice, would be a colossal waste of time, effort[,] and expense.

If I thought for one moment my prior involvement with any of the lawyers had an influence on any of my decisions, I would step aside. I practiced law for thirty years, attended school in South Carolina, have been active in social, civic, family and bar organizations, clubs and events all of my adult life and thankfully have formed many types of relationships with many people, a lot who are lawyers who practice in my court on an everyday basis. I am cognizant of these relationships, but if I recused myself when that happened, I could not hold court.

Accordingly, the court denied Appellants' motion for recusal.[19]

None of the disqualification situations outlined by Canon 3(E) were present here. Rather, Appellants' allegations concern mere social relationships between the circuit judge or his family members and Respondents' counsel of record or their family members. Some of these relationships, such as Rosen's father's physician-patient relationship with the judge, are tenuous. Thus, we find that, under the

---

[19] At the March 29, 2010, hearing, the judge revealed that he has known Appellants' attorney, Joel Bailey, for 36 years and they have "shared a lot of social time together over the years." Furthermore, the judge stated on the record he "maintained what I considered to be a very cordial social relationship" with Appellants' counsel, Thomas Pendarvis. Both of the judge's sons worked with Pendarvis at another law firm while they were in school, and both maintained friendships with him.

Rules, the circuit judge was not required to disclose any of these relationships with counsel, nor recuse himself. *See* Commentary, Canon 3(E) ("A judge *should* disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." (emphasis added)).

If anything, the judge's decision to disclose these relationships during the course of the litigation demonstrates his sensitivity to assuaging any concerns about his impartiality. *See Simpson*, 377 S.C. at 525, 660 S.E.2d at 277 (finding the judge's "remarks about her concern for not disclosing the information at the beginning of the hearing do not show any bias or prejudice but instead show her sensitivity to any apprehension each side might have in her ability to make a fair and impartial ruling in the case"); *Doe v. Howe*, 367 S.C. 432, 441, 626 S.E.2d 25, 29 (Ct. App. 2005) ("Because Doe made no showing of actual prejudice, we find no abuse of discretion in the trial judge's refusal to disqualify himself. If anything, the trial judge demonstrated sensitivity toward any concerns Doe might have had regarding his impartiality by voluntarily making full disclosure of his and his law clerk's contacts with Howe and Howe's counsel."). Furthermore, if friendship or social interactions became the standard for disqualification, then as the judge stated in the Recusal Order, members of the judiciary would rarely be able to hold court in this state.[20] Obviously, there could be circumstances where an extremely close friendship could rise to the level of disqualification, as the Canons do not limit disqualification to the scenarios listed under Canon 3(E)(1). However, under the facts of this case, the relationships and interactions that occurred in this lawsuit did not require the judge's recusal.

Importantly, Appellants have also failed to prove that they suffered any prejudice as a result of the judge's refusal to recuse himself in this case. Other than adverse rulings, Appellants have not presented any evidence of prejudice or bias against them. *See Mortg. Elec. Sys., Inc. v. White*, 384 S.C. 606, 616, 682 S.E.2d 498, 503 (Ct. App. 2009) ("The fact [that] a trial judge ultimately rules against a litigant is not proof of prejudice by the judge, even if it is later held the judge

---

[20] As the judge stated at the hearing on the matter, "[F]rom day one, because I had 30 years of practice practically every lawyer that come[s] before me . . . I have socialized with, I have been friends with . . . and I have never ever allowed any personal friendships, past acquaintances, children's relationships with other people's children to influence anything that I've done."

committed errors in his rulings.") (citation omitted). Mere conjecture cannot support a recusal motion. *See* 46 Am. Jur. 2d *Judges* § 208 (1994) ("Allegations of facts that are merely frivolous or fanciful will not support a motion to disqualify on the ground of prejudice, nor will conclusory statements, conjecture, or innuendo be sufficient to support a motion for disqualification."). If anything, the trial judge bent over backwards to provide Appellants an opportunity to be heard, from denying Respondents' motion for summary judgment early in the case, to providing Appellants numerous opportunities to cure their noncompliance and allowing for numerous hearings on discovery matters.

In addition, the Record supports all of the court's orders in this case, including the Discovery Order and the Privilege Order. *See Burgess v. Stern*, 311 S.C. 326, 331, 428 S.E.2d 880, 884 (1993) (finding "an objective view of the record and circumstances surrounding the convoluted proceedings in [that] case lead[] to the conclusion that [the judge's order], and the ensuing orders [were] supported by the evidence" and concluding that no prejudice arose from the alleged impartial acts); *Ellis*, 315 S.C. at 285, 433 S.E.2d at 857 (finding a judge's impartiality might reasonably be questioned "when his factual findings are not supported by the record" and holding that the judge's factual findings in that case were not supported by the record). Thus, Appellants have not proven they suffered any prejudice from the judge's alleged bias again them.

Finally, the timeliness of the motion is questionable. *See Duplan Corp. v. Milliken*, 400 F. Supp. 497, 510 (D.S.C. 1975) ("Timeliness is essential to any recusal motion. To be timely, a recusal motion must be made at counsel's first opportunity after discovery of the disqualifying facts.").The Appellants were well-aware that the judge planned to issue the Dismissal Order when they raised their concerns regarding the judge's impartiality and moved for recusal on the eve of the Dismissal Order, nearly two years after the judge disclosed the bulk of these relationships. Therefore, the recusal motion appears to be nothing more than a last-ditch effort to delay the Court's filing of that order. Thus, we also find Appellants' motion for recusal untimely.

Based on the foregoing, we hold that the judge was not required to recuse himself under the circumstances. Furthermore, the frivolous nature and questionable timing of this motion only serve to lend further support to the sanctions imposed in the Dismissal Order.[21]

---

[21] Appellants further argue the circuit court erred in failing to ensure that

## CONCLUSION

In conclusion, we make clear that we do not hold Appellants' able, competent, and experienced counsel at fault for Appellants' discovery abuses. Appellants' counsel diligently and professionally pursued these claims on behalf of their clients. Unfortunately, Appellants have brought about the dismissal of their claims by their continued refusal to comply with the court's orders, and they have only themselves to blame for this harsh result.

Therefore, for the foregoing reasons, we affirm the circuit court's dismissal of this case and remand this case to the circuit court for further proceedings.

**AFFIRMED.**

**BEATTY, KITTREDGE and HEARN, JJ., concur. PLEICONES, J., concurring in part and dissenting in part in a separate opinion.**

---

Appellants received a fair and impartial forum in which to litigate their claims, thereby depriving them of their right to due process of law under the United States and South Carolina constitutions. Because this issue is tied to whether or not the court erred in refusing to recuse himself and we find that he did not, we need not reach this issue. *See Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 307, 676 S.E.2d 700, 706 (2009) (appellate court need not discuss remaining issues when determination of prior issue is dispositive).

**JUSTICE PLEICONES:**  I concur in part and dissent in part.  I concur in the majority's affirmance of the recusal ruling but dissent from its affirmance of the contempt/sanctions issue.  In my view, this appeal requires we review the merits of the Privilege Order as well as the Dismissal Order.  As explained below, I find the Privilege Order is affected by an error of law and would reverse the Dismissal Order's contempt findings related to that order.  Further, I would hold the findings of fact cited in the Dismissal Order in support of the conclusion that appellants were in contempt of the Discovery Order are woefully inadequate and would therefore reverse that contempt holding.  Finally, I would reverse the Dismissal Order's sanctions as the contempt findings cannot stand.

I begin with the majority's erroneous limitation of the scope of appellant's appeal.  The Dismissal Order begins:

> This matter comes before the Court on [Respondents'] two Motions for Sanction . . . For the reasons set forth below, the Court grants [Respondents'] motions.  The Court finds and hereby declares that [Appellants] are in contempt of court as a result of their willful failure to comply with the Court's order dated July 28, 2009 [the Privilege Order] and dismiss each of the above captioned actions with prejudice as sanctions for such contempt . . . The Court further finds and declares that [Appellants] are in contempt of court for the separate and additional reason that they have willfully disobeyed the Court's Order dated March 3, 2009 [the Discovery Order].

It is well-settled that a *party*[22] can obtain review of the merits of a discovery order only after refusing to comply and being held in contempt.  On appeal from the contempt order, the contemnor may argue that the contempt finding must be reversed because the underlying discovery order was itself improper.  *E.g. Grosshuesch v. Cramer*, 377 S.C. 12, 659 S.E.2d 112 (2008).

---

[22] I note the majority cites the non-party discovery appeal rule from *Ex parte Whetstone*, 289 S.C. 580, 347 S.E.2d 881 (1986).

The majority acknowledges that appellants have done exactly what is required of them but concludes that our review is somehow limited. I quote from the majority's opinion:

> Throughout the course of the litigation, the circuit court issued numerous discovery rulings . . . [T]o challenge the specific rulings of the discovery orders, the normal course is to refuse to comply, suffer contempt, and appeal from the contempt finding . . . Only after Respondents filed a motion for sanctions and Appellants were found to be in contempt of court as part of those sanctions, did they appeal. While this was a final order for purposes of appellate review, as it ordered dismissal of the case [sic], the merits of the underlying discovery orders are not before this Court on appeal.

The majority is simply wrong to hold that appellants are now foreclosed from arguing that the discovery orders upon which the Dismissal Order's contempt findings and sanctions rest were erroneous. Further, I disagree with the majority's representation that appellants have only raised a general challenge to the Privilege and Discovery Orders. *See* fn. 15, *supra*. Each of the five appellants' briefs argue the merits of the Privilege Order and the Discovery Order. In each brief, the argument regarding the flaws in the Privilege Order begins on page 12, and of those in the Discovery Order begins on page 27. Appellants' ability to challenge the specifics of the Discovery Order is limited by the circuit court's inadequate factual findings.

I fundamentally disagree with the majority's decision to limit its review of these consolidated appeals.

## A. Privilege Order

Appellants contend, and I agree, that the circuit court erred in finding them in contempt for violating the Privilege Order. The Privilege Order was largely predicated on the circuit court's determination that appellants had waived their attorney-client privilege, applying the test for waiver derived from *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975). The circuit court found the statute of limitations "was a major issue in this case" and held that by

putting the statute in issue, appellants "implicitly waived their claims of privilege with respect to documents dated (i.e. created) more than three years prior to the filing of this lawsuit."

Appellants contend the circuit court erred in adopting the *Hearn* "at-issue" waiver theory in the Privilege Order and that this error requires that we reverse the contempt findings that are based on *Hearn* as well as the sanctions in the Dismissal Order.  I agree.

In my view, the circuit court erred in adopting the *Hearn* at-issue waiver test because this test substantially diminishes the attorney-client privilege without regard to the important public interests that privilege is designed to advance.

South Carolina has long recognized the attorney-client privilege.  *See*, *e.g.*, *Clary*

*v. Blackwell*, 160 S.C. 142, 149, 158 S.E. 223, 226 (1931).  The privilege is grounded

> upon a wise public policy that considers that the interests of society are best promoted by inviting the utmost confidence on the part of the client in disclosing his secrets to his professional advisor, under the pledge of the law that such confidence shall not be abused by permitting disclosure of such communications.

*South Carolina Highway Dept. v. Booker*, 260 S.C. 245, 254, 195 S.E.2 615, 619-

20 (1973); *see also State v. James*, 34 S.C. 49, 57, 12 S.E. 657, 660 (1891) ("[T]he rule of evidence which holds as inviolable professional communications between attorney and client is one of the most important, and in all forms must be maintained in all its integrity.").  The attorney-client privilege is not absolute, rather, its traditional contours balance competing public interests.  For example, courts have traditionally held it does not extend to communications in furtherance of criminal, tortious, or fraudulent

conduct. *Ross v. Medical University of South Carolina*, 317 S.C. 377, 384, 453 S.E.2d 880, 884-85 (1994).

While the client may waive the privilege, *Drayton v. Industrial Life & Health Ins.*, 205 S.C. 98, 108, 31 S.E.2d 148, 152 (1944), the rule in South Carolina has been that such a "waiver must be distinct and unequivocal[,]" and we have held that a claim of implied waiver should be treated with caution. *State v. Thompson*, 329 S.C. 72, 76-77, 495 S.E.2d 437, 439 (1998). Notwithstanding that caution must be exercised in finding waiver, it is widely recognized that a client impliedly waives the privilege when he relies on confidential *communications* with his attorney to make out a claim or defense. *See Savino v. Luciano*, 92 So.2d 817, 819 (Fla. 1957) ("[W]hen a party has filed a claim, based upon a matter ordinarily privileged, the proof of which will necessarily require that the privileged matter be offered in evidence, we think that he has waived his right to insist . . . that the matter is privileged."); *Pennsylvania v. Harris*, 32 A.3d 243 (Pa. 2011) ("In-issue waiver occurs when the privilege-holder asserts a claim or defense, and attempts to prove that claim or defense by reference to the otherwise privileged material."); *see also*, *e.g.*, *Sedco Int'l S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982) (courts find waiver by implication when a client testifies about the attorney-client communication, places the attorney-client relationship at issue, or cites the attorney's advice as part of a claim or defense). *Hearn* alters this traditional implied waiver standard.

*Hearn* summarized the factors common to the exceptions to the rule of privilege as

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

68 F.R.D. at 581. This statement of the factors for finding implied waiver dramatically expands the traditional rule. Because the existence of privilege for attorney-client communications has significance only when the

information sought to be protected is relevant to a case, and when the opposing party believes access to the information is vital to his defense, factors two and three operate merely to limit waiver of the privilege to the most sensitive of the client's communications.

The first factor of the *Hearn* test requires that assertion of the privilege be the result of an affirmative act on the part of the person asserting the privilege, such as by filing suit. As used by the *Hearn* court and as applied by the circuit court in this case, this factor expands the circumstances in which a party impliedly waives his attorney-client privilege. Rather than being limited to situations in which the client inserts the privileged *communications* into the controversy, waiver is expanded to situations in which the client raises any *issue* to which the privileged communications are relevant. As explained below, *Hearn* has been rejected by most courts and many commentators.

Adoption of the *Hearn* test virtually eliminates attorney-client privilege in a wide range of cases without taking into account the public policy on which attorney-client privilege is grounded or that the well-settled contours of the attorney-client privilege already balance the competing public interests. *See*, *e.g.*, *In re County of Erie*, 546 F.3d 222, 227-29 (2d Cir. 2008) discussing *Hearn* and its critics, rejecting the *Hearn* test, and holding that when good faith is asserted as a defense, waiver is implied only when the client relies on privileged advice to establish good faith); Kevin Bennardo, *At Issue Waiver of the Attorney-Client Privilege in Illinois: An Exception in Need of a Standard*, 30 N. Ill. U. L. Rev. 553, 561 (2010) ("By focusing on relevancy and fairness, the Hearn test seeks to remedy the 'problem' caused by the truth-suppressing effect of the attorney-client privilege. The anticipatory waiver test, on the other hand, seeks to address the problem created by one party selectively relying on a privileged communication while attempting to shield other privileged communications--thereby 'garbling' the truth. It is only in this 'truth-garbling' scenario, rather than the truth-suppressing scenario (a scenario inherent in all privileges), that waiver of the privilege should be found." (internal footnote omitted)); Note, *Developments in the Law: Privileged Communications*, 98 Harv. L. Rev. 1450, 1641-42 (1985) (*Hearn* concept of unfairness refers to incompleteness of evidence rather than

traditional concept in privilege context of unfairness as abuse of a privilege; logic of *Hearn* leads to "outrageous" results).[23]

---

[23] For additional criticism of *Hearn* and its progeny, see *Remington Arms Co. v. Liberty Mut. Ins. Co*., 142 F.R.D. 408, 413 (D. Del. 1992) ("The core problem,

according to this line of reasoning [criticizing *Hearn*], is that expansive language

for determining implied waiver leads to a type of ad hoc determination that ignores the system-wide role of the attorney-client privilege and undermines any confidence that parties can place in that privilege.  These authorities contend that extremely liberal waiver rules increase litigation costs and judicial time spent on discovery disputes, favor the wealthiest litigants, undermine the values served by the privilege rules, and vary according to the identity of the litigants and their purported need for privileged information." (internal citations omitted)); *Trustees of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc*., 266 F.R.D. 1 (D.D.C. 2010); *United States v. Ohio Edison Co.,* No. C2-99-1181, 2002 WL 1585597 (S.D. Ohio July 11, 2002); *Mortgage Guar. & Title Co. v.*

*Cunha,* 745 A.2d 156 (R.I. 2000); *Public Service Co. of New Mexico v. Lyons*, 10

P.3d 166 (N.M. Ct. App. 2000); *Wisconsin v. Hydrite Chem. Co.*, 582 N.W.2d 411 (Wis. Ct. App. 1998); *Wardleigh v. Second Jud. Dist. Ct.*, 891 P.2d 1180 (Nev.

1995); *Aranson v. Schroeder*, 671 A.2d 1023 (N.H. 1995); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co*., 32 F.3d 851, 864 (3d Cir. 1994); *Hewlett-Packard Co. v.*

*Bausch & Lomb, Inc*., 115 F.R.D. 308 (N.D. Cal. 1987); and *Smith v. Kavanaugh, Pierson & Talley*, 513 So.2d 1138 (La. 1987).

Moreover, particularly in the context of a statute of limitations defense, adoption of the *Hearn* test produces the result that

> [i]n virtually every case in which the statute of limitations . . . is pleaded as a defense and the client relies on the discovery rule to overcome the limitation period, the opposing party would be able to inquire of the client's counsel: Did your client tell you anything in confidence about what he or she knew that differs from or contradicts what he or she stated in responses to discovery?

*Darius v. City of Boston*, 741 N.E.2d 52, 57 (Mass. 2001).  I agree with the *Darius* court that "[t]o permit that kind of inquiry would pry open the attorney-client relationship and strike at the very core of the privilege." *Id*. at 56-57.

Because in my view the *Hearn* at-issue waiver rule sweeps far too broadly, eviscerating the attorney-client privilege without regard to the weighty public interest it serves, the circuit court erred in adopting it in the Privilege Order.  The circuit court ordered appellants to produce documents that would have been privileged but for the court's application of the *Hearn* at-issue test.  It found that appellants had waived attorney-client and "any otherwise applicable privilege" in documents created more than three years before the lawsuit was filed that contained appellants' litigation and trial strategies "through their actions (e.g. the allegations in the . . . Complaints)."  The circuit court's determination in the Dismissal Order that appellants were contumacious in refusing to produce these documents and that the sanctions of dismissal and attorneys' fees were appropriate depended in part on its determination that appellants had waived all privileges in these documents merely by filing suit.  Because the circuit court's ruling was based on an error of law, i.e. *Hearn*, I would reverse and remand for the circuit court to consider whether appellants' other violations of the Privilege Order warrant a finding of contempt.  This remand necessarily requires reconsideration of the scope of any sanctions.

## B.  Discovery Order

Appellants also contend they should not have been found in contempt and sanctioned for violations of the Discovery Order. I agree with appellants that the flaws in the Dismissal Order finding appellants in violation of the Discovery Order require we reverse the Dismissal Order on this ground as well.

I agree with appellants that the trial judge's specifications of deficiencies in their compliance with the Discovery Order are simply too vague, and rely too heavily on mere references to memoranda prepared by respondents' counsel,[24] to support the finding of contempt. Moreover, the decision to dismiss the cases and impose other sanctions for noncompliance with discovery "should be imposed only in cases involving bad faith, willful disobedience, or gross indifference to the opposing party's rights." *McNair v. Fairfield Cty.*, 379 S.C. 462, 466, 665 S.E.2d 830, 832 (Ct. App. 2008) (internal citations omitted). Here, the circuit court's findings that appellants' conduct rose to this level are inexorably tied to its findings regarding disobedience of the wrongfully decided Privilege Order.

I would reverse the Dismissal Order and remand, but affirm the recusal ruling as I find no evidence of judicial prejudice in this record. *State v. Howard*, 384 S.C. 212, 682 S.E.2d 42 (Ct. App. 2009). It is patent that these cases have been pending far too long, and that appellants share in the responsibility for the delay. I am optimistic that the parties and trial judge will work diligently to bring these cases to speedy and appropriate resolutions upon remand.

---

[24] Each of the five findings of contempt in the Dismissal Order is supported only by citation to a memorandum prepared by respondents. *See Higgins v. Med. Univ. of South Carolina*, 326 S.C. 592, 486 S.E.2d 269 (Ct. App. 1997) (cautioning against reliance on factual statements in memoranda submitted by counsel).