## THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Donna B. Welch, individually and as Personal Representative of the Estate of Melvin G. Welch, deceased, Respondent,

v.

Advance Auto Parts, Inc., American Honda Motor Co., Inc., Atlas Asbestos Co, Atlas Turner, Inc. as successor to Atlas Asbestos Co, a foreign company, Bahnson, Inc., Covil Corporation, Daniel International Corporation, Davis Mechanical Contractors, Inc., Ellington Insulation Company, Inc., Fluor Constructors International f/k/a Fluor Corporation, Fluor Constructors International, Inc., Fluor Daniel Services Corporation, Fluor Enterprises, Inc., General Parts, Inc. individually and as successor-in-interest to Carquest Corporation; Goodrich Corporation f/k/a The B. F. Goodrich Company, The Goodyear Tire & Rubber Company, Graybar Electric Company, Inc., Honeywell International, Inc. individually and as successor-in-interest to Allied Signal, Inc., as successor to Bendix Corporation, Morse Tec LLC f/k/a Borgwarner Morse Tec LLC, and successor-by-merger to Borg-Warner Corporation, Occidental Chemical Corporation as successor to Durez Corporation; O'reilly Automotive Stores, Inc., Paramount Global f/k/a Viacomcbs Inc., f/k/a CBS Corporation, a Delaware corporation f/k/a Viacom, Inc., successor-by-merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation, Pneumo Abex LLC successor-in-interest to Abex Corporation, Redco Corporation f/k/a Crane Co., Reinz Wisconsin Gasket LLC f/k/a and/or successor to Reinz Wisconsin Gasket Co. and Wisconsin Gasket Manufacturing Co., a wholly owned subsidiary of Dco LLC, Rust Engineering & Construction, Inc., Rust International Inc., Southern Insulation, Inc., Spirax Sarco, Inc., Union Carbide Corporation, Westrock

MWV, LLC individually and as successor-in-interest to Westvaco, ZF Active Safety US Inc. f/k/a Kelsey-Hayes Company, Defendants,

of which Atlas Turner, Inc. is the Appellant,

and

Donna B. Welch, individually and Personal Representative of the Estate of Melvin G. Welch, deceased,

and

Peter D. Protopapas, Duly Appointed Received for Atlas Turner, Inc., are Respondents.

Appellate Case No. 2023-001096

———————

Appeals From Richland County
Jean Hoefer Toal, Circuit Court Judge

———————

Opinion No. 28284
Heard February 11, 2025 – Filed May 21, 2025

———————

**AFFIRMED IN PART AND REVERSED IN PART**

———————

Stephen Lynwood Brown, Russell Grainger Hines, and James D. Gandy, III, all of Clement Rivers, LLP, of Charleston, for Appellant Atlas Turner, Inc.

Theile Branham McVey, of Kassel McVey, of Columbia; Aaron Daniel Chapman and Ka'Leya Q. Hardin, both of Dallas, TX; Charles William Branham, III, of Dean Omar

Branham Shirley, LLP, of Dallas, TX; and Todd Barnes, of Indianapolis, IN, all for Respondent Donna B. Welch.

Jonathan M. Robinson and Shanon N. Peake, both of Smith Robinson Holler DuBose Morgan, LLC, of Columbia; George Murrell Smith, Jr., of Smith Robinson Holler DuBose Morgan, LLC, of Sumter; and John Kenneth Chandler and Brian Montgomery Barnwell, both of Rikard & Protopapas, LLC, of Columbia, all for Respondent Peter Demos Protopapas.

---

**JUSTICE HILL:** In this appeal from an asbestos case, Atlas Turner, Inc. (Atlas Turner) challenges the order of the trial court imposing discovery sanctions and appointing a Receiver. Given Atlas Turner's conspicuous misconduct, we conclude the sanctions were plainly justified and the appointment of the Receiver was also within the trial court's discretion. Accordingly, we affirm the order granting sanctions, and we affirm the portion of the Receivership order appointing the Receiver over Atlas Turner's Insurance Assets. However, because the trial court erred in giving the Receiver authority beyond that necessary to investigate and collect Atlas Turner's Insurance Assets, we reverse the Receivership order in part.

## I.    Facts

Melvin G. Welch, of Abbeville, South Carolina, died in 2023 of mesothelioma caused by his exposure to asbestos. His widow and personal representative, Respondent Donna B. Welch, sued Atlas Turner and others she alleges caused his death. Atlas Turner is a still active Canadian company that produced and sold asbestos insulation. Atlas Turner's customer lists reveal it shipped asbestos insulation to South Carolina. It is alleged Welch was likely exposed to Atlas Turner's asbestos products while he worked in Greenwood, South Carolina.

Respondent's lawsuit was brought in Richland County and assigned to the Honorable Jean H. Toal, who presides over the South Carolina asbestos docket. Cases on the docket are subject to standard mandatory discovery procedures and scheduling orders so they may be timely resolved.

Atlas Turner moved to dismiss the claims against it on the ground that South Carolina lacked personal jurisdiction over it. After the trial court denied Atlas Turner's motion, it ordered that Atlas Turner participate in discovery. Atlas Turner

ignored deposition notices served upon it pursuant to Rule 30(b)(6), SCRCP, which requires a corporation to designate a representative to appear and be questioned according to the rule. The trial court warned Atlas Turner that if it did not cooperate with the Rule 30(b)(6) notices and answer other pending discovery, it would be sanctioned and possibly held in contempt.

Atlas Turner refused to respond to any discovery, even jurisdictional discovery (discovery limited to unearthing facts about the extent of Atlas Turner's activities and contacts with South Carolina) ordered by the trial court. It claimed it would not produce a Rule 30(b)(6) witness at the scheduled deposition time "or ever." It maintained it had no witness available because none of its employees had knowledge of the company's activities during the relevant period covered by the complaint. It alternatively argued that the Québec Business Concerns Records Act (QBCRA) prohibited it from responding to a South Carolina Court order for discovery. Specifically, Atlas Turner asserted that complying with the order would entail disclosing the contents of the company's records and such disclosures were prohibited by the QBCRA (a topic we will return to later in this opinion).

The trial court held Atlas Turner in contempt for its "willful and intentional" refusal to comply with court ordered discovery. As a sanction, the trial court struck Atlas Turner's answer, placing it in default. The trial court later appointed a Receiver over "the Insurance Assets" of Atlas Turner.

We certified Atlas Turner's appeal pursuant to Rule 204(b), SCACR.

## II.    Discovery Sanctions

We first take up the propriety of the discovery sanctions. Imposing sanctions for violating discovery rules is guided by the trial court's discretion, meaning we will not disturb the sanctions unless no reasonable evidence supports them or they were imposed contrary to the correct law. *Innovative Waste Mgmt., Inc. v. Crest Energy Partners GP, LLC*, 445 S.C. 19, 28, 911 S.E.2d 406, 410 (2025); *Dunn v. Dunn*, 298 S.C. 499, 502, 381 S.E.2d 734, 735 (1989).

Atlas Turner asks us to reverse the trial court's sanction of striking its answer. This issue need not detain us long, for the record overflows with examples of Atlas Turner's cavalier disdain of the elementary rules of civil procedure. Fortune may favor the bold, but a party that persists in a bold refusal to comply with basic ordered discovery may soon realize it is the architect of its own misfortune. So it is here.

Atlas Turner disputes that its refusal to attend the Rule 30(b)(6) deposition was willful. It says it could not comply because it had no witness who knows what the

company did forty odd years ago.  It further claims the QBCRA forbids it from producing documents requested in the Rule 30(b)(6) notice and other discovery and also prevents it from allowing anyone to review its corporate records to prepare themselves to be a Rule 30(b)(6) designee.  Both claims are untenable.

A. Rule 30(b)(6), SCRCP

Rule 30(b)(6) depositions are often vital to any litigation involving companies, the government, or other organizations.  The whole idea behind Rule 30(b)(6) is to allow a party the opportunity to discover relevant facts about an organization by questioning the organization's designated representative under oath.  The rule allows a party to name the organization as the deponent "and describe with reasonable particularity the matters on which examination is requested."  Rule 30(b)(6), SCRCP.  The organization then has the duty to designate one or more persons who will testify on its behalf and "the matters on which he will testify."  *Id*.  The designee(s) "shall testify as to matters known or reasonably available to the organization." *Id*.

Our Rule 30(b)(6) tracks the federal rule, which was adopted in 1970 to stop the childish game-playing that often plagued parties seeking to find facts from corporations.  Before the rule change, a party had to identify by name the specific corporate employee it wished to depose about relevant matters.  What ensued was a guessing game resembling "Marco Polo," where the requesting party often knew nothing about the labyrinths of the company's personnel structure or labor division.  And the company had no duty to prepare the witness for the deposition.  8A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2103 (3d ed. April 2025 Update).  The purpose of the new Rule was to "curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it."  Committee Note to 1970 Amendments to Fed. R. Civ. P. 30(b)(6).

This history underscores that Rule 30(b)(6) gives an organization the privilege of selecting the person who will speak for it on the designated matters, but also imposes a duty to prepare the speaker.  *See* 7 James Wm. Moore et. al., *Moore's Federal Practice* § 30.25[3] (3d ed. 2021) ("[T]he organization has an affirmative duty to prepare the designated deponents so that they can give full, complete, and non-evasive answers to questions regarding the relevant subject matter.").

This duty does not end, as Atlas Turner seems to think, with the end of the designees' personal, first-hand knowledge of the noticed matters.  Instead, the organization must endeavor in good faith to prepare its designee to testify on matters not only

known to him, but on those topics within the notice that are, as the rule puts it, "reasonably available" to the organization. Rule 30(b)(6), SCRCP; Moore, *supra*, at § 30.25[3] ("Thus, the rule requires a good faith effort to find out the relevant facts, which may mean collecting information, reviewing documents, and interviewing employees with personal knowledge."); 8A Wright and Miller, *supra*, at § 2103 (in a Rule 30(b)(6) deposition, "unlike all other depositions, there is an implicit obligation to prepare the witness[, and a]s specified in the rule, this preparation is not limited to matters of which the witness has personal knowledge, but extends to all information reasonably available to the responding organization"). Many courts have so interpreted the rule. *See, e.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (holding defendant violated Fed. R. Civ. P. 30(b)(6) by failing to prepare designee as to issues beyond designee's personal knowledge but within corporate knowledge of organization: the company had duty to "prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources"); *Bigsby v. Barclays Cap. Real Estate, Inc.*, 329 F.R.D. 78, 81 (S.D.N.Y. 2019) (same); *Crawford v. George & Lynch, Inc.*, 19 F. Supp.3d 546, 554 (D. Del. 2013) ("The duty of preparation goes beyond the designee's personal knowledge and matters in which the designee was personally involved. If necessary, the deponent must use documents, past employees, or other resources to obtain responsive information." (citation omitted)).

We find it telling that when Atlas Turner argued South Carolina had no personal jurisdiction over it, it relied on an affidavit of Richard Dufour, Canadian counsel for Atlas Turner. In his affidavit, Mr. Dufour declares Atlas Turner has never been registered or authorized to do business in South Carolina; never had offices, employees, or agents in the State; and never owned any bank accounts or real property here. As its counsel, Mr. Dufour is an agent of Atlas Turner. Given that he made these statements of "facts" in his affidavit "based upon" his "personal knowledge, information and belief," it is curious how he gained access to these facts if, as Atlas Turner contends, the historical facts of their corporate conduct are unknown to anyone. In a later affidavit, Mr. Dufour states:

> Atlas Turner, Inc. has no former employees competent to testify to the topics listed on the 30(b)(6) Notices of Deposition in this case, and for the most part Atlas Turner, Inc. does not even maintain or possess the records that would be necessary to educate a witness to be able to testify to matters contained in the 30(b)(6) Notices of deposition.

We know of no reason why Mr. Dufour could not have been designated as the Rule 30(b)(6) corporate representative. *See* Moore, *supra*, at 30.25[3] ("There is no rule that would prevent corporate counsel . . . from serving as a Rule 30(b)(6) deponent.").

## B. The QBCRA

The second reason Atlas Turner gives as to why it could not produce a Rule 30(b)(6) designee is that the QBCRA protects it from disclosing the contents of company records in response to a discovery request from any court outside of the province of Québec. As relevant here, the QBCRA provides:

> [N]o person shall, pursuant to or under any requirement issued by any legislative, judicial or administrative authority outside Québec, remove or cause to be removed, or send or cause to be sent, from any place in Québec to a place outside Québec, any document or résumé or digest of any document relating to any [business] concern.

QBCRA, Que.Rev.Stat. ch 278, §§ 1(b), 2 (1964). The QBCRA is a local law known as a "blocking statute." The argument that a foreign blocking statute, such as the QBCRA, is an insuperable barrier to discovery in American courts has been rejected by the United States Supreme Court. *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) ("It is well settled that [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."). Many courts have addressed whether the QBCRA furnishes a valid excuse for a Québec company to resist discovery ordered by foreign courts. Almost all have answered that question with a resounding "No." *See, e.g.*, *Am. Indus. Contracting, Inc. v. Johns–Manville Corp.*, 326 F.Supp. 879, 880–81 (W.D. Pa. 1971). A number of these rulings were in asbestos cases, several of which featured Atlas Turner making the exact QBCRA-based arguments it recycles here. *See Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 644–46, 644 n.24 (D.S.C. 1992) (rejecting identical QBCRA theories presented by Atlas Turner); *see also Lyons v. Bell Asbestos Mines, Ltd.*, 119 F.R.D. 384, 387–89 (D.S.C. 1988) (finding company did not show it would be violating the QBCRA by producing documents and answering interrogatories, and noting even if the QBCRA did apply and "assuming the applicability of comity and other principles of international law to the present discovery dispute, those principles do not compel blind obedience to the legislative enactments of foreign jurisdictions").

We are mindful of comity concerns raised by the QBCRA. The Court in *Société Nationale* noted factors informing a comity analysis include the specificity of the discovery sought, its importance to the litigation, whether the information sought originated in the United States, whether there is an alternative way to secure the information, and what effect the ruling would have on important interests of the respective sovereigns. *Société Nationale*, 482 U.S. at 544 n.28. Any comity concerns with the QBCRA are slight. Québec is not a sovereign nation, only a province of one. And the Supreme Court of Canada, the sovereign of which Québec is a part, has held that, as a constitutional matter, the QBCRA does not bar discovery of a Québec company's records sought by a party located in another Canadian province. *Hunt v. Lac d'Amiante du Québec Ltée*, 4 S.C.R. 289 (1993). Indeed, the court went so far as to say the QBCRA lacks "minimum standards of order and fairness" and is therefore "counter to comity." *Id.*

We can dispatch any lingering comity worries by considering the *Société Nationale* factors. The discovery sought here included not only the Rule 30(b)(6) notice but standard mandatory discovery in South Carolina asbestos cases. The information sought was important and specific. It was not indigenous to Canada, for many of the facts related to Atlas Turner's role in Mr. Welch's asbestos exposure occurred in this state, a state where Atlas Turner chose to do business. *See Société Nationale*, 482 U.S. at 540 n.25 ("Petitioners made a voluntary decision to market their products in the United States . . . they are subject to the same legal constraints, including the burdens associated with American judicial procedures, as their American competitors."). No alternative source for these facts has been suggested, except for Atlas Turner's inappropriate proposal that Respondent's counsel could search for them in "repositories" of asbestos data compiled by other plaintiffs from other cases. Finally, ordering discovery despite the QBCRA would not undermine an important national interest of Canada, for that country's own supreme court has downgraded the QBCRA and left it all but toothless. On the other hand, were we to allow the QBCRA to block the discovery here, it would "represent an extraordinary exercise of legislative jurisdiction" by a local foreign province over South Carolina's courts. *Id.* at 544 n.29.

Our rejection of the QBCRA as a legitimate block on the discovery sought is further justified by Atlas Turner's failure to show how our rejection hampers its ability to respond. Atlas Turner tells us that, if it were to educate a witness from its corporate records (records it also denies even exist), then it would violate the QBCRA. This argument cannot survive the scrutiny of reason. If Atlas Turner's interpretation of the QBCRA were correct, one wonders how it conducted business in the United States and around the world for so many decades.

Judge Toal gave Atlas Turner extensive opportunities to express its positions, such as they were, and be heard. She listened closely. She understood and explored its arguments. She also understood that its overbearing position was a grotesque distortion of elementary discovery principles. She said: "Enough."

We agree. In selecting the appropriate sanctions, the trial court must consider the nature of the discovery refused, the discovery stage of the case, willfulness, and prejudice. *Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 435, 673 S.E.2d 448, 457 (2009). The sanction of striking a party's pleadings is extreme, but it is a specific response our rules endorse. Rule 37(b)(2)(C), SCRCP. Such a sanction is "harsh medicine," reserved for episodes of discovery misconduct displaying bad faith, willful disobedience, or a callous indifference to the rights of other parties and the discovery process. *Davis v. Parkview Apartments*, 409 S.C. 266, 282, 762 S.E.2d 535, 544 (2014); *Rickerson v. Karl*, 412 S.C. 215, 221, 770 S.E.2d 767, 770 (Ct. App. 2015). Any sanction imposed must be sufficient to vindicate the important rights the discovery rules guarantee and the essential tools they provide to allow lawyers to prepare their clients' cases for trial.

Atlas Turner claims the trial court exceeded its sanctioning discretion because it only considered its willful misconduct. But Atlas Turner was emphatic that it did not intend to comply with repeated discovery orders issued by the trial court. The trial court did not need to spell out what all involved knew: that the nature of the discovery at issue was the very right to discovery itself, in all its stages. *See Scott v. Greenville Hous. Auth.*, 353 S.C. 639, 652, 579 S.E.2d 151, 158 (Ct. App. 2003) ("Discovery is the quintessence of preparation for trial and, when discovery rights are trampled, prejudice must be presumed.").

Striking the pleadings of a party who refuses to abide by the basic governing rules was, under the circumstances here, a measured act of discretion. Atlas Turner was consistent in its campaign to stymie any discovery about them. Our civil procedure is guided by rules whose prime directive is to "secure the just, speedy, and inexpensive determination of every action." Rule 1, SCRCP; *see also In re Anonymous Member of S.C. Bar*, 346 S.C. 177, 193, 552 S.E.2d 10, 18 (2001) ("The primary objective of discovery is to ensure that lawsuits are decided by what the facts reveal, not by what facts are concealed." (quoting *In re Alford Chevrolet–Geo*, 997 S.W.2d 173, 180 (Tex. 1999))); *id*. ("[T]he discovery process is designed to 'make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958))). A party can foul out of the

process.  *See Innovative Waste*, 445 S.C. at 22, 911 S.E.2d at 407 ("[I]n discovery, time does eventually run out on bad behavior.").

### III.    Personal Jurisdiction

The trial court found Atlas Turner placed its products into the stream of commerce with the knowledge or expectation that the products would be sold and used by consumers in South Carolina.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980) ("The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."); *Hammond v. Butler, Means, Evins & Brown*, 300 S.C. 458, 462, 388 S.E.2d 796, 798 (1990) ("[A]t the pre-trial stage of the proceedings, the plaintiff need only make a prima facie showing [of personal jurisdiction] by pleadings and affidavits.").  According to Respondent's prima facie showing, Mr. Welch was exposed to asbestos in 1965 to 1967, and Atlas Turner sold asbestos-containing pipe insulation and spray insulation to a Charlotte based wholesaler installer who supplied South Carolina companies in 1967, as well as to a Greenville based installer from 1968 to 1973.  Evidence also indicated (1) the asbestos-containing pipe insulation sold by Atlas Turner matched the description of the pipe insulation installed at the plant where Mr. Welch worked in South Carolina and (2) Atlas's spray insulation was also used at the plant where Mr. Welch worked.

Persons and companies that choose to do business in South Carolina receive in return the benefit and protection of our laws and our legal system.  Our laws allow them the confidence to enter contracts here that they are assured will be enforced impartially by our courts and that their economic rights will be protected.  These legal benefits and protections are essential to the formation of reliable markets and an appealing business environment.  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 367 (2021).  Anyone entering and profiting from a business market in South Carolina that our laws and courts helped foster has fair warning that any wrongs he commits here will be subject to the remedies of those same courts.  He also has notice that should he create harm to the citizens of this state, it would be reasonable and fair that our citizens could sue him here, rather than having to travel to pursue him elsewhere.  Due process, at least as far as personal jurisdiction is concerned, has always considered this exchange fair, the balance true.  *Id.* at 355 ("When a company . . . serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit.").  Some parties, after enjoying the benefits on their side of the scale, seek to trick the balance.  When brought into the courts of the state in which they selected to transact business—for injuries done to the citizens and workers of that

state by their conduct—these parties respond with shock and surprise. And uninformed (but not uninterested) observers decry that such a reckoning with justice is "bad for business."

The trial court found Respondent had produced enough evidence at the pretrial stage to show Atlas Turner chose to do business here and conducted business to a point where it should have known it would be held to account for any injury its business caused here. Atlas Turner has not appealed the trial court's ruling denying its motion to dismiss for lack of personal jurisdiction. Respondent asks us to declare Atlas Turner has abandoned and waived this issue. Atlas Turner claims it has "reserved" the personal jurisdiction issue, maintaining that it could not appeal the issue because the ruling was interlocutory. It is settled law that we may consider the otherwise interlocutory ruling denying a motion to dismiss for lack of personal jurisdiction when it is joined with other appealable matters. *QZO, Inc. v. Moyer*, 358 S.C. 246, 252, 594 S.E.2d 541, 545 (Ct. App. 2004). Nevertheless, we will not address the issue now, and nothing in this opinion may be construed as affecting the merits of any later appeal of the personal jurisdiction issue.

## IV. Appointment of Receiver

Atlas Turner next contends the trial court abused its discretion in appointing a Receiver. "[T]he power of appointment of a receiver should be resorted to only in exceptional circumstances[.]" *First Carolinas Joint Stock Land Bank of Columbia v. Knotts*, 191 S.C. 384, 402, 1 S.E.2d 797, 805 (1939).

The equitable right to have a Receiver appointed is "an ancient one." *Pelzer v. Hughes*, 27 S.C. 408, 416, 3 S.E. 781, 785 (1887). Its roots reach back to Elizabethan times when English courts appointed Receivers to manage and preserve the assets of a debtor's estate when there was a risk the debtor was purposefully diminishing it. 1 Ralph Ewing Clark, *Clark on Receivers* § 4 (3d ed. 1959).

A Receiver is an officer of the court, appointed to marshal and collect—to receive—the assets of the corporation. In that sense, the Receiver stands in the corporation's shoes. *In re Am. Slicing Mach. Co.*, 125 S.C. 214, 218, 118 S.E. 303, 304 (1923). Receiverships were more common before the Great Depression and the expansion of the federal bankruptcy laws, but they can still be a useful equitable tool. *Digit. Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 777–78 (6th Cir. 2023). The effect of appointing a Receiver means that the Receiver, as a "hand of the court," exercises power and control over the defendant's assets and property specified in the appointment order and administers them at the court's discretion for the benefit of creditors and the debtor's estate. *Allen v. Cooley*, 53 S.C. 414, 446, 31 S.E. 634, 646

(1898). Title, though, remains in the defendant's name. A Receiver must administer the estate in compliance with the appointing order and "in accordance with the laws of this State." Rule 66(a), SCRCP.

A. Appointment of Receiver under S.C. Code Ann. § 15-65-10(5) (2005)

Our law allows appointment of a Receiver in several circumstances, including "[i]n such other cases as are provided by law or may be in accordance with the existing practice, except as otherwise provided in this Code." § 15-65-10(5). At common law, an equity court had the inherent power to appoint a Receiver before judgment. 1 Clark, *supra*, at § 149. A Receiver may only be appointed before judgment in the rarest of cases, when "there is the strongest reason to believe that the plaintiff is entitled to the relief demanded in his complaint, and there is danger that the property will be materially injured before the case can be determined." *Richland County. v. S.C. Dep't of Revenue*, 422 S.C. 292, 313, 811 S.E.2d 758, 769 (2018) (quoting *Pelzer*, 27 S.C. at 416, 3 S.E. at 785). This extreme power may only be used in extreme cases, such as where a defendant's conduct demonstrates it is fraudulently concealing or disposing of assets that may be responsive to a later judgment. 1 Clark, *supra*, at § 181. The Receiver may then collect the defendant's assets and administer property. *Id.* at § 163. We have followed this general rule and upheld the appointment of a Receiver before judgment where the plaintiff has made a prima facie showing that the defendant intends to fraudulently avoid or defeat the plaintiff's recovery. *See Virginia-Carolina Chem. Co. v. Hunter*, 84 S.C. 214, 220–21, 66 S.E. 177, 179 (1909) ("[W]hen a debtor is trying to defeat his creditors by an act or course of conduct which indicates moral fraud—a conscious intent to defeat, delay, or hinder his creditors in the collection of their debts—then a court of equity will grant any relief within its jurisdiction appropriate and effective to protect creditors against the fraud without requiring the creditor to run the risk of losing his debt from the delay of obtaining judgment and a return of nulla bona on the execution."). As this Court explained:

> When a business man, merchant, or manufacturer or farmer disposes of large resources, and then, professing to have nothing, leaves his debts unpaid, and sets his creditors at arm's length by refusing to give any account of his property or to take any interest in the satisfaction of their claims, the court is warranted in drawing the inference that there has been a fraudulent disposition of the property.

*Id*. at 223, 66 S.E. at 180.

We would not be inclined to affirm a trial court's appointment of a Receiver before judgment except in the rarest case. Because Receiver appointment is an equitable remedy and equity follows the law, one holding a tort, contract, or other legal claim generally has no right before judgment to a debtor's property. *See Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497–501 (1923) (explaining an unsecured contract claim is insufficient to warrant appointment of Receiver before judgment); 12 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § § 2983 (3d ed. April 2025 Update) (stating party seeking Receivership against defendant must show he has some legally recognized right to defendant's property "that amounts to more than a mere claim against defendant"). We decline to upset the trial court's discretionary decision here, for this is that rare instance when equity's aid may be called upon before the legal claims have been reduced to judgment. Atlas Turner's strident and outspoken refusal to comply with the trial court's orders convinces us it will continue to act in bad faith as the case against it progresses. It is not lost upon us that Atlas Turner has long experience as a defendant in asbestos cases. We note too that when faced with lawsuits—for allegedly causing serious injury and death to American workers and citizens related to the pernicious products it sold for profit even after the lethal risk these products posed was known—its tactic has been to claim that, if the courts exerted jurisdiction over them, it would offend the "traditional notions of fair play and substantial justice" due process guarantees. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). When that ploy fails, Atlas Turner's version of due process is to refuse to abide by court orders requiring it to answer basic information. It is alleged Atlas Turner has come into our state, turned profits by selling its hazardous wares in our state, and inflicted grievous harm on citizens in our state. Then, when the shadow of the courthouse door falls upon it, it insists it was never here, and if a court asks anything else about it, it responds: we have nobody who knows anything. Atlas Turner seems to claim its corporate form allows it to "both be and not be." Robert H. Jackson, What Price "Due Process"?, 5 N. Y. L. Rev. 435, 438 (1927).

We conclude Atlas Turner's conduct justified the appointment of a Receiver before judgment. First, Atlas Turner's contemptuous disregard of the court's discovery orders and other conduct demonstrates it is seeking to evade its responsibilities as a civil litigant. There is evidence that Atlas Turner's corporate policy for responding to asbestos lawsuits is to adopt a "minimum defense posture" and incur default judgments. Atlas Turner followed that policy here. Second, Atlas Turner represented to the trial court that it had no Insurance Assets relevant to these cases. However, there is evidence Atlas Turner was involved in a transaction that may have compromised some of its potential insurance coverage. The record further discloses

that Atlas Turner has refused to tender its policies to certain insurers for defense and indemnity. *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 317 (8th Cir. 1993) (affirming appointment of Receiver where defendant refused to cooperate in discovery and provided inaccurate financial information: "Faced with this pattern of willful nondisclosure and false disclosure, followed by transfer to avoid a tenacious judgment creditor, the district court was well within its discretion in turning to a drastic remedy such as a receiver").

The evidence supports the finding that Atlas Turner engaged in moral fraud against the trial court, the state of South Carolina, and Respondent. *Virginia-Carolina Chem. Co.*, 84 S.C. at 220–21, 66 S.E. at 179; 12 Wright & Miller, *supra*, at § 2983 ("Factors that courts have considered relevant to establishing the requisite need for a receivership include . . . fraudulent conduct on the part of defendant . . . .").

### B. Jurisdiction to Appoint a Receiver

Atlas Turner also says the trial court had no jurisdiction to appoint a Receiver because it neither owns nor possesses any property within the borders of South Carolina. Consequently, according to Atlas Turner, a South Carolina Receiver is powerless to control any of its property. The order appointed a Receiver over Atlas Turner's Insurance Assets. Atlas Turner has not explained where it contends these assets are located, other than its general claim that all property it owns rests outside the borders of this state.

Atlas Turner points to *Pollock v. Carolina Interstate Building & Loan Ass'n*, 48 S.C. 65, 25 S.E. 977 (1896), and claims a Receiver has no power to affect property outside South Carolina. This distorts *Pollock*, for there the court only held an order of a North Carolina court appointing a Receiver over a North Carolina company did not affect the validity of service of a lawsuit filed here on the company's South Carolina registered agent. *Id*. at 74–76, 25 S.E. at 980. Atlas Turner's recourse to *Booth v. Clark*, 58 U.S. 322 (1854), fares no better, for there it was held only that a Receiver appointed by a state court had no absolute right to sue in a foreign jurisdiction. 58 U.S. at 338. This aspect of *Booth* has been supplanted by various federal statutes and rules. *See* 2 Ralph Ewing Clark, *Clark on Receivers* § 591 (3d ed. 1959); *Mentink v. World Time Corp. of Am.*, 131 F.R.D. 210, 211 (S.D. Fla. 1990); 28 U.S.C. § 754 (2018). Although a Receiver's right to sue in another state is not squarely before us, that issue is controlled by the law of the foreign state, the full faith and credit clause, and comity. *See* 65 Am. Jur. 2d Receivers § 260 (Jan. 2025 Update); 2 Clark, *supra*, at § 591. We have allowed a foreign Receiver to sue in South Carolina. *Wilson v. Keels*, 54 S.C. 545, 553–56, 32 S.E. 702, 704–06 (1899).

We hope Atlas Turner does not believe a court exercising its equity powers cannot order a party over whom it has personal jurisdiction to convey and produce its property and assets, regardless of where they may be located. Equity can compel one over whom it has personal jurisdiction to do an act even though that act may affect property outside the court's territorial jurisdiction. That equity may force just such a thing has been a basic principle recognized for centuries. *See Penn v. Lord Baltimore* (1750) 1 Ves. Sr. 444 (ordering specific performance of contract even through order affected lands in Pennsylvania and Maryland). Chief Justice Marshall, relying on *Penn*, held that, in contract cases, an equity court's jurisdiction "is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree." *Massie v. Watts*, 10 U.S. 148, 158–63 (1810) (holding Kentucky federal court had jurisdiction to compel defendant over whom it had personal jurisdiction to convey land located in Ohio); *Muller v. Dows*, 94 U.S. 444, 449 (1876) ("It is here undoubtedly a recognized doctrine that a court of equity, sitting in a State and having jurisdiction of the person, may decree a conveyance by him of land in another State, and may enforce the decree by process against the defendant."); *Booth*, 58 U.S. at 332 ("Although the property of a defendant is beyond the reach of the court, so that it can neither be sequestered nor taken in execution, the court does not lose its jurisdiction in relation to that property, provided the person of the defendant is within the jurisdiction. By the ordinary course of proceeding, the defendant may be compelled either to bring the property in dispute, or to which the defendant claims an equitable title, within the jurisdiction of the court . . . ."). Because equity has jurisdiction over the defendant, "it is immaterial that the res is beyond the territorial jurisdiction of the court." *City of Jamestown v. Pennsylvania Gas Co.*, 1 F.2d 871, 878 (2d Cir. 1924) (New York federal district court had power to order defendant to cut off its gas supply located in Pennsylvania).

Atlas Turner mistakes not only equity's power, but the Receiver's role. The Receiver stands in the companies' shoes. He may do whatever the corporation could do in relation to its property, for it is in his possession subject to the control of the court. We doubt a company or individual would claim it had no right to funds it owned on deposit at a bank simply because the bank is located in another jurisdiction. No one would dispute a holder of an asset such as an insurance policy has the power and the right to invoke the policy's benefits, regardless of where the policy "resides." And nothing would prevent a state court that has personal jurisdiction over the company from compelling the company to do whatever was necessary to bring the benefits of the policy to litigation in this state. *See* Rule 66(b), SCRCP (stating a Receiver "shall . . . have general power and authority to sue for and collect the debts, demands and rent belonging to the debtor . . ."); Restatement (Second) of Conflict of Laws § 53

cmt. a (1971) ("A state which has judicial jurisdiction over a person is not limited to the issuance through its courts of a money judgment against him. The state may likewise order the person to do, or to refrain from doing, one or more acts. And the power of the state to make such an order is not affected by the fact that the acts called for are to be done in another state."). In one well-known case, a Receiver appointed by a New York court for a California defendant, over whom it had personal jurisdiction, was authorized to retrieve a thoroughbred racehorse from California and ship it to Kentucky. *Madden v. Rosseter*, 187 N.Y.S. 462, 462–63 (N.Y. 1921).

In like manner, courts have required defendants over whom they have jurisdiction to transfer foreign stock the defendant owns to a Receiver. *See United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962) (defendant ordered to turn over stock located in Bahamas to Receiver in New York: "Personal jurisdiction gave the court power to order [the defendant] to transfer property whether that property was within or without the limits of the court's territorial jurisdiction"); *Stewart v. Laberee*, 185 F. 471, 474 (9th Cir. 1911) ("A court may control by its receivership property beyond its territorial jurisdiction when it has jurisdiction of the parties, and it may restrain them from interfering with the receiver's possession of such property."); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1188 (11th Cir. 1991) ("[I]t is undisputed that the district court has *in personam* jurisdiction over the defendant, thus the receiver could be empowered to reach foreign assets."). We therefore affirm the trial court's appointment of a Receiver for Atlas Turner's Insurance Assets.

We take a moment to discuss Atlas Turner's conduct in these cases and how it affects Receivership. Its conduct fits the strategy we earlier mentioned: to shun the civil process of South Carolina's courts to the point of being declared in default and then fight the enforceability of the default judgment on what it perceives to be friendlier soil. That is in fact what an English company has done in another South Carolina asbestos case where the trial court appointed a Receiver. And an English court has gone along, ruling as a matter of private international law that the defaulting company did not submit to jurisdiction in South Carolina and English law will only enforce foreign judgments against a corporate defendant if the company has established a "fixed place of business" in the foreign forum. *Cape Intermediate Holdings Ltd. And Cape PLC v. Protopapas* [2024] EWHC 2999 (Ch), 13–14, 49–51. The English Court went so far as to issue an injunction against the Receiver, purporting to bar him from action even in South Carolina. *Id.* at 72.

The English court reasoned that English law may restrain a foreign court to prevent "injustice." *Id.* at 69–70. It quoted a decree that gave as an example a foreign court whose standard for personal jurisdiction was so wide as to be against accepted

international law principles. *Id*. at 70. The English court then proceeded to note that the powers given to the Receiver stretched worldwide. *Id*. It reasoned that the English company could not risk fighting its case in South Carolina because it would then be submitting to jurisdiction here. *Id*. at 70–71.

Shocking to American eyes, the English court enjoined the Receiver "from acting or purporting to act for or on behalf of" the English company in default, even in a South Carolina court. *Id*. at 61, 72.

We appreciate that the laws of different countries may differ, even countries that have a special relationship with each other. Our respect and spirit of comity—not to mention our duty to follow the law—does not permit us to enjoin a court of another sovereign nation from interfering with our rulings on the propriety of a Receivership. As it would with any court, such a ruling by us would be in the words of Lord Scarman, a *brutum fulmen* (an empty noise).

### C. Scope of Receiver's Authority

It is common knowledge that the asbestos industry knew of the dangers of their product as early as the 1930's. *Borel v. Fibreboard Paper Prods. Corp*., 493 F.2d 1076, 1083–86 (5th Cir. 1973). In early asbestos cases, some asbestos companies claimed they did not know of the dangers until 1965, the year Dr. Irving J. Selikoff published his landmark work on asbestos related diseases. *Id*. (discussing when the dangers of asbestos became widely known, including the publication of Dr. Selikoff's studies). Mr. Welch was allegedly exposed in the late 1960s and early 1970s, well after the wide release of Dr. Selikoff's findings. Lung cancer and mesothelioma are particularly horrendous diseases. Atlas Turner is in default. If there are Insurance Assets available to compensate Respondent for Mr. Welch's medical costs, lost income, pain, and suffering as a result of Atlas Turner's corporate misconduct, justice requires that they be brought to bear. We hold any Insurance Assets owned by Atlas Turner that may cover Mr. Welch's injuries are properly within the Receivership estate, meaning those Insurance Assets are within South Carolina's exclusive jurisdiction. *See Palmer v. State of Texas*, 212 U.S. 118, 125 (1909) ("If a court of competent jurisdiction, Federal or state, has taken possession of property, or by its procedure has obtained jurisdiction over the same, such property is withdrawn from the jurisdiction of the courts of the other authority as effectually as if the property had been entirely removed to the territory of another sovereignty."); *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (recognizing that insurance policies and proceeds may be part of a Receivership estate and placed in the state court's exclusive *in rem* jurisdiction).

Further, it is well established that a Receiver has the right and duty to collect and accumulate the property and assets of the defendant specified in the appointment order, including its rights and claims. 1 Clark, *supra*, at § 163; 2 Clark, *supra*, at § 365. This includes rights under an insurance policy the defendant has purchased. We hold the trial court properly gave the Receiver power to pursue claims in South Carolina's jurisdiction to bring the Insurance Assets to bear in covering Mr. Welch's injuries. However, we hold that power does not properly extend to reach every claim relating to Atlas Turner's assets and business activities. *Stanford Int'l Bank*, 927 F.3d at 841.

As such, we find it appropriate shrink the scope of the Receivership order. *See Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971) ("The remedial powers of an equity court must be adequate to the task, but they are not unlimited."). The trial court defined Insurance Assets as:

> [A]ny insurance policy, proceeds of insurance policies, claims related to those policies, information relating to those insurance policies, including, but not limited to mail, files of counsel, or other information which is reasonably calculated to lead to the discovery of admissible evidence about those insurance policies or any other assets which are related to, touch or are otherwise relevant to such insurance.

We find equity only allows insurance policies that have the potential to cover Mr. Welch's injuries to be included in this definition, and we reverse and vacate the portion of this definition that allows the Receiver to have power over "any other assets which are related to, touch or are otherwise relevant to such insurance." The Receivership order does not grant the Receiver entry into the Atlas Turner boardroom or some vague right to "take over" operation of the company.

Finally, we note Atlas Turner retains the right to post a bond to lift the Receiver appointment order. S.C. Code Ann. § 15-65-50 (2005).

## V. Conclusion

As can be seen, Atlas Turner's arguments throughout this case have been contrary to longstanding legal principles. It persists in repeating long debunked theories that no thinking court would accept. This causes us to repeat once again what no one should have to be told: that a lawsuit "is not a children's game, but a serious effort on the part of adult human beings to administer justice[.]" *Griffin v. Cap. Cash*, 310 S.C.

288, 292, 423 S.E.2d 143, 146 (Ct. App. 1992) (quoting *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 873 (4th Cir. 1947)).

No matter what manner of injury compensation system a society chooses to be governed by, there will be those who say it does too much, and those who say it does too little. Some will point to its excesses, others to its limitations. Unwelcome outcomes become sensationalized, often unmoored from objective facts that were critical to the outcome but inconvenient to the shaping of soundbites or op-ed pieces.

We are aware there are many cases on the asbestos docket in South Carolina. The docket of this Court and the court of appeals have seen a radical increase in appeals by asbestos defendants. Almost all of these appeals were properly dismissed as premature and obviously interlocutory. We have yet to see an asbestos case where the trial court has exercised personal jurisdiction over a defendant that did not meet the level of minimum contacts with our state that due process demands. If we were to see one, we would not hesitate to hold that the South Carolina courts lack jurisdiction.

Likewise, we emphasize that while equity allows the appointment of a Receiver before judgment in this unusual case, it is an extraordinary remedy reserved for the most extraordinary cases. It is not to be used in the typical default case. This case is atypical and extraordinary where Atlas Turner's behavior warrants the relief ordered by the veteran trial judge who gave Atlas Turner many chances to comply and follow the rules like every other litigant. If Atlas Turner disagreed with the trial courts' pre-trial personal jurisdiction ruling, it had the usual recourse, including raising the issue again at trial. *Mid-State Distribs., Inc. v. Century Importers, Inc.*, 310 S.C. 330, 335, 426 S.E.2d 777, 780–81 (1993). Instead, Atlas Turner acted as if a ruling against them granted it license to ignore its responsibilities. Such conduct has consequences.

It is unfortunate that Atlas Turner has refused to abide by or honor its responsibilities under our process of civil law. When Atlas Turner defied the rule of law, the trial court not only followed it but enforced it by responding with remedies the law has long recognized. It is these rulings that we uphold today.

We therefore affirm the discovery sanctions against Atlas Turner, and we affirm in part and reverse in part the order appointing the Receiver.

**AFFIRMED IN PART AND REVERSED IN PART.**

**KITTREDGE, C.J., FEW, JAMES, JJ., and Acting Justice Paula H. Thomas, concur.**